284 N.J. Super. 491 (1995)
665 A.2d 1113
ASTRO PAK CORPORATION, PLAINTIFF-RESPONDENT,
v.
FIREMAN'S FUND INSURANCE COMPANY, DEFENDANT-APPELLANT, AND THE HARTFORD ACCIDENT AND INDEMNITY CO., INDUSTRIAL INDEMNITY COMPANY, FEDERAL INSURANCE COMPANY AND UNDERWRITERS AT LLOYD'S, LONDON, DEFENDANTS. ASTRO PAK CORPORATION, PLAINTIFF-RESPONDENT,
v.
THE HARTFORD ACCIDENT AND INDEMNITY COMPANY DEFENDANT-APPELLANT, AND FIREMAN'S FUND INSURANCE COMPANY, DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 1995.
Decided June 30, 1995.
*492 Before Judges DREIER, BRAITHWAITE and BILDER.
Pamela J. Minetto argued the cause for appellant Hartford Accident and Indemnity Co. (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; Ms. Minetto and William P. Ross, on the brief).
Julius F. Harms and Gary D. Centola, admitted pro hac vice argued the cause for appellant Fireman's Fund Insurance Company *493 (Caron, Greenberg & Fitzgerald, attorneys; Mr. Harms, on the brief).
Stephen P. Chawaga argued the cause for respondent (Fitz-Patrick & Tanker, attorneys; Mr. Chawaga and Henry B. Fitz-Patrick, Jr., on the brief).
The opinion of the court was delivered by DREIER, P.J.A.D.
Defendants, The Hartford Accident and Indemnity Company and Fireman's Fund Insurance Company, appeal from a declaratory judgment determining that the comprehensive general liability insurance policies issued by the two insurers to plaintiff, Astro Pak Corporation, require the insurers to indemnify Astro Pak against the claims of Transtech Industries and its affiliated companies. Transtech is the owner and was the operator of the Kin-Buc disposal facility in Edison Township. The facility was one of the largest government-approved landfills in New Jersey. Astro Pak itself was a licensed transporter of liquid hazardous waste, solvents and chemicals.
Between April 12, 1973 and July 15, 1976[1] Astro Pak transported and discharged at the Kin-Buc landfill over a million and a half gallons of waste, solvents and chemicals. Where the waste was contained in barrels, they were placed in the landfill as directed by the operator. Where the waste was liquid in a tank truck, the truck drivers would drive to the top of the landfill where the operator would have dug a hole, and the waste would be discharged into the hole and then covered. This immense landfill rose to heights of between four and nine stories. It supposedly was constructed to be impervious so that the deposited wastes would not affect the surrounding land or water. Unfortunately *494 this was not so, and leachate from the landfill was polluting the adjoining Raritan River.
Disposal operations were terminated at the Kin-Buc landfill on July 18, 1976 pursuant to an order of the New Jersey Department of Environmental Protection. Upon receiving news that the landfill had been closed pursuant to a DEP order, Astro Pak immediately ceased all deliveries to the site. In 1979, the United States sued Kin-Buc, Transtech and others for the recovery of remediation costs. In 1983, it ordered eleven parties to remediate the site. No claim was made against Astro Pak in either proceeding.
In 1984, the Federal Environmental Protection Agency informed Astro Pak that it was potentially liable under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 to 9675, for some remediation costs. Astro Pak was assessed with 1.23% of the costs based upon the total volume of identifiable waste it had deposited at Kin-Buc and settled with the EPA for $87,804.52, presumably from its own funds and not from those of any insurer. Astro Pak also acknowledges that it participated in the settlement of a single personal injury suit brought by neighbors of the landfill.
In 1990, Transtech instituted a federal action against all the users of Kin-Buc, including Astro Pak. In Transtech's second amended complaint filed in March 1993, it sought recovery for past and future remediation costs which it estimated would exceed one hundred million dollars. It is this claim by Transtech that occasioned Astro Pak's declaratory judgment action to establish the liability of its principal insurers.
Fireman's Fund issued a comprehensive general liability policy to Astro Pak having aggregate and single occurrence limits of $250,000 for a three-year period, April 20, 1974 through April 20, 1977. The insurer alleges that it canceled its policy effective July 5, 1976. As of July 5, 1976 Astro Pak was insured by The Hartford Insurance Company under policies issued between July 5, 1976 and July 5, 1984. There is some confusion concerning the dates on which the policies of the two insurers were issued, but it *495 appears that the changeover occurred in 1976 because it would coincide with the date that Fireman's Fund contends its coverage ceased, as well as confirm the parties' recollection that this was approximately the same time the Kin-Buc landfill was closed.
Both insurers are required to indemnify Astro Pak up to the policy limits for property damage caused by a covered occurrence. The policies, however, provided that property damage claims "arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence." The Hartford's aggregate limits were the same $250,000 for the first three years of coverage, thereafter the limit was raised to $300,000. The policies, however, contain a pollution-exclusion clause that makes the policies inapplicable
to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants unto or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.[2]
The principal issue in this case involves the application of Morton Int'l, Inc. v. General Accident Ins. Co. of Am., 134 N.J. 1, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), to the claims against these two insurers. With some refinements, Fireman's Fund contended that its exclusion clause applied because the dumping at the landfill had been an intentional discharge of a known pollutant upon the land, and that any "occurrence" under the policy was dependent upon there being actual damage, which did not occur until after it was off the risk. The Hartford claimed that its policies covered only the period after plaintiff ceased delivery to the landfill, and, furthermore, at that time plaintiff knew of leakage from the landfill and *496 thus of the potential for loss. The Hartford therefore asserts that its policies could not cover this claim.[3]
After extensive briefing and argument in the Law Division, Judge Bachman reserved decision on December 16, 1993, and on April 25, 1994 delivered a comprehensive oral opinion rejecting defendants' defenses and determining that the respective policies of Fireman's Fund and The Hartford were available to plaintiff. He focused upon both the actions of plaintiff delivering the material to the landfill and the damages which were caused by the landfill leaking into the surrounding land and the Raritan River. He correctly interpreted Morton Int'l as precluding insurers from enforcing the pollution exception to the policy except where the discharge was intentional. He found as an uncontroverted fact that plaintiff had no knowledge of the initial pollution from the landfill which commenced as early as 1971, and that plaintiff discontinued dumping at the site as soon as it had any inkling that any pollutant was being discharged into the adjoining land or water. Judge Bachman acknowledged that the extent of the damages for which plaintiff might be liable was then unknown, but that such uncertainty would not preclude a declaratory judgment requiring indemnification.
We will first treat the issues raised by The Hartford. It first claims that it did not insure plaintiff until after the landfill had been closed. We noted earlier some disparity in the dates of coverage, and in fact the trial judge assumed that The Hartford's coverage commenced in 1975 rather than 1976. For the sake of this argument, we will accept the 1976 date advanced by the insurer. The Hartford claims that there are two doctrines that preclude plaintiff's claim, the "known loss" doctrine and the "loss in progress" doctrine. Under these rules, an insurer is protected from risks known to the insured prior to obtaining insurance and *497 from a continuing loss that had begun before the inception date of the policy. These arguments were not addressed by Judge Bachman in his opinion because they were only sketchily raised by the insurer. The easy answer for this court would be to state that the failure to raise the issues in the Law Division preclude their argument here. Nieder v. Royal Indemnity Ins. Co., 62 N.J. 229, 234, 300 A.2d 142 (1973). Since, however, there was some brief mention of these defenses, we will address them.
Plaintiff contends that as one considers these doctrines, the property damage caused by the seepage from the landfill is not the key. Rather, plaintiff claims it is the insured's actual or constructive knowledge of its potential liability for the loss that determines whether a subsequent contract of insurance covers the occurrence. Plaintiff also questions whether the two doctrines are part of New Jersey law.
While no New Jersey opinion has applied either doctrine by name, both federal cases and out-of-state cases recognize the doctrines and even state that the doctrines are applied in New Jersey in principle. In Continental Ins. Co. v. Beecham, Inc., 836 F. Supp. 1027 (D.N.J. 1993), Judge Barry stated:
The known loss doctrine is based on the fundamental principle that insurance is intended to cover risks which are not definitely known to the insured. The loss in progress doctrine, as differentiated from the known loss doctrine, provides that one cannot insure a loss that is already in progress.
[Id. at 1046.]
The doctrines have their roots in the prevention of fraud. Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co., 997 F.2d 172, 179 (6th Cir.1993). Insurance policies are written to protect against fortuitous occasions, but when they are misused to protect against certainties, fraud results. Ibid. Thus, plaintiff reasons, unless the insured has some idea that it may be legally liable for loss from the damages, it cannot be seeking protection against certainties. See Outboard Marine Corp. v. Liberty Mut. Ins. Co., 154 Ill.2d 90, 180 Ill.Dec. 691, 697, 607 N.E.2d 1204, 1210 (1992) (stating that insurance is, by its nature, contingent, and once risk is known, it becomes uninsurable).
*498 Morton Int'l precluded enforcement of the standard pollution-exclusion clause "except that the clause will be interpreted to preclude coverage in cases in which the insured intentionally discharges a known pollutant, irrespective of whether the resulting property damage was intended or expected." 134 N.J. at 78, 629 A.2d 831. The Court further stated that it would "expressly limit [its] holding concerning the limited effect of the pollution-exclusion clause to cases in which the insured or an agent specifically authorized to act for the insured intentionally discharges a known pollutant." Ibid. Against this language, the application of which to these defendants we will discuss later, we must examine the application of the "known loss" and "loss in progress" doctrines. We will also put to one side for the time being the question whether the applicable discharge is the placing of the pollutants into the landfill, or the escape of the pollutants from the landfill.
A pre-Morton expression of New Jersey law which apparently falls well within the Morton preclusion, is found in Jackson Tp. Mun. Utils. Auth. v. Hartford Accident & Indem. Co., 186 N.J. Super. 156, 451 A.2d 990 (Law Div. 1982). The court there stated that an "industrial enterprise who discharges, disburses or deposits hazardous waste material knowing, or who may have been expected to know, that it would pollute, will be excluded from coverage by the clause." Id. at 164, 451 A.2d 990. This expression notes that coverage exclusion relates not to the depositing of the waste material but to the knowledge that it would pollute. So too with the "known loss" or "loss in progress" doctrines.
If the prevention of fraud is at the heart of these rules, the "loss" must relate to a known occurrence that would trigger indemnification by the insurer. Only if plaintiff knew that its acts had already subjected it to potential liability because of leakage into the surrounding land, water or air, would the insurers have a claim to a defense. Insurance companies "`do not cover economic detriment that is not fortuitous from the point of view ... of the insurer's liability.'" Ambassador Ins. Co. v. Montes, 76 N.J. 477, *499 496, 388 A.2d 603 (1978) (Clifford, J., dissenting) (quoting Robert E. Keeton, Insurance Law § 5.3(a) at 278-279 (1971)). The loss was still fortuitous here in that Astro Pak had not been aware of its own potential liability when The Hartford's policies were written.
The uncontroverted facts bear out plaintiff's position. An internal memo of the EPA stated in early 1976 that the agency was "examining what legal measures, if any, EPA can take against Kin-Buc," not against Astro Pak. It was not until years later that there was any liability claimed against Astro Pak such as this claim for which Transtech sought reimbursement. The fact that Astro Pak was aware that Kin-Buc was closed due to possible contamination in July 1976 does not equate with Astro Pak's actual or constructive knowledge of an insured claim against Astro Pak. In fact, CERCLA had not yet been enacted, and Astro Pak was not even a named defendant under the 1979 lawsuit by the government against Transtech and others. CERCLA was passed in 1980; the 1979 lawsuit defendants were notified in 1981 that they were potentially liable under CERCLA; and the EPA did not put Astro Pak on notice of its potential liability until January 11, 1984, after the commencement of Astro Pak's final policy year with The Hartford.
The Hartford also argues that under a "continuous trigger" analysis, which it correctly presumes would apply, it would not be responsible to Astro Pak because the manifestation of injury occurred no later than July 18, 1976, when Kin-Buc was closed. The Supreme Court in Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 650 A.2d 974 (1994), adopted the continuous trigger theory to identify "the point at which the law will say that injury requires indemnity." Id. at 457, 650 A.2d 974. In Owens-Illinois, the Court made it clear that the "continuous trigger" theory extends to property damage claims made as a result of long-term environmental contamination. It stated that "[p]roperty-damage cases are analogous to the contraction of disease from exposure to toxic substances like asbestos. Like a person exposed to toxic *500 elements, the environment does not necessarily display the harmful effects until long after the initial exposure." Id. at 455, 650 A.2d 974. The identification of a single point in time, as urged by The Hartford, is the antithesis of this approach:
[W]hen progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL [comprehensive general liability] policy. That is the continuous-trigger theory for activating the insurers' obligation to respond under the policies.
[Id. at 478-479, 650 A.2d 974.]
While plaintiff ceased to deposit additional pollutants in the landfill before it closed on July 18, 1976, the slow progression of these contaminants into the surrounding land and water continued well after this date. This exposure implicates The Hartford's policies.
Both insurers claim that the declaratory judgment was premature because liability in the underlying Transtech action had not been determined. A declaratory judgment action, however, is precisely the medium for determining issues such as those before us. See T & E Indus., Inc. v. Safety Light Corp., 123 N.J. 371, 397, 587 A.2d 1249 (1991). There is no question under Morton Int'l that environmental-response costs and remediation costs fall within the ambit of "property damage" under a comprehensive general liability policy. 134 N.J. at 27, 629 A.2d 831. Thus, as in T & E Indus., Inc. v. Safety Light Corp., supra, we are "satisfied that if plaintiff is compelled to clean up the property, it should be indemnified." 123 N.J. at 397, 587 A.2d 1249.
At the heart of both insurers' arguments is the proposition that plaintiff intentionally deposited the pollutants at the Kin-Buc landfill. Thus, they claim, the exception in Morton Int'l should apply. Judge Bachman found that the pollution exclusion was inapplicable because Astro Pak deposited the waste at "an approved dump." He further stated that the materials were "being delivered to a site licensed by the State of New Jersey to receive" them, rather than being dumped elsewhere. This analysis by the trial judge is what was contemplated by the Supreme Court in Morton Int'l, supra. There, the Court stated "[a] general rule in *501 environmental-pollution coverage litigation that would permit intent to injure to be presumed simply on the basis of a knowing discharge of pollutants would be unjustified." 134 N.J. at 86, 629 A.2d 831. The Court then established the procedure that a trial court should follow in deciding this question. It stated:
[W]e hold that in environmental-coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all the available evidence, "exceptional circumstances [exist] that objectively establish the insured's intent to injure." Voorhees [v. Preferred Mutual Ins. Co., 128 N.J. 165, 185, 607 A.2d 1255 (1992)]. Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently, or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm.
[Id. at 86-87, 629 A.2d 831.]
The trial judge here determined that the discharge into the State-approved landfill was not the polluting of the "environment." While this statement might be somewhat broad if applied to unusual situations, it is clear that Astro Pak's actions constituted possible pollution only because of the defective nature of the landfill. The offending "pollution" was the escape caused by this defect, not the placing of the pollutants into the landfill.
This might be best explained by an analogy. Had Astro Pak deposited the polluting material in a large above-the-ground tank from time to time, and the tank later leaked, causing run-off to adjoining property, it would be difficult to say that the pollution had been caused each time a bucket of sludge was thrown into the tank. Rather, the escape from the tank which caused the damage would be the operative event. If the tank were an in-the-ground tank, the analysis should be the same. The fact that the tank was placed on another's property should also not change the equation, provided it was reasonable to assume that the tank was capable of holding the pollutants and was properly authorized by the State to receive the material. The same should be true if the hypothetical tank is replaced by a presumably impervious landfill licensed by the State to accept the pollutants.
*502 The perceptions as they existed when the deliveries were made to the landfill are not affected by the later EPA order determining that the land constituting the Kin-Buc landfill itself must be cleared of pollution. Under CERCLA, transporters of hazardous materials, such as Astro Pak, are liable for any discharges of pollutants, 42 U.S.C. § 9607(a), and are subject to private actions for contribution for remediation expenses by other dischargers. 42 U.S.C. § 9613(f). The respective responsibility between Transtech and Astro Pak will be resolved in the federal action.
Disposal records show Astro Pak delivered waste oil, sludge and mixed solvents to Kin-Buc throughout the 1974 to 1976 period of the Fireman's Fund policy, when the escape of pollutants from the landfill was known to EPA, but not to Astro Pak. There also were occurrences within The Hartford's policy periods. The pollution, first identified as early as 1971, continued beyond the closing of Kin-Buc. Although clean-up efforts began as early as 1980, Transtech was still submitting remediation plans to EPA in 1984, the last year of The Hartford's coverage. The property damage for which indemnification is sought thus occurred within both insurers' policy periods, even though Astro Pak's deposit of the pollutants may have preceded The Hartford's policies. See Owens-Illinois, Inc. v. United Ins. Co., supra, 138 N.J. at 475, 650 A.2d 974. The contamination of the ground, water and soil was progressive and indivisible, and, under CERCLA, Astro Pak is exposed to civil liability for contribution to this contamination, no matter how innocent.
The insurers in this case are bound by Morton Int'l, supra, since they wrote their policies to contain the pollution exclusions that were approved and marketed contrary to their express provisions. They are limited to the factors quoted earlier from Morton Int'l, supra, 134 N.J. at 86-87, 629 A.2d 831, which clearly protect Astro Pak's deposit of the pollutants into Kin-Buc's State-licensed landfill. When we, as did Judge Bachman, focus on the discharge from the landfill for which plaintiff may be held liable in the *503 Transtech action, we concur with the Law Division's determination that the insurers are liable.
Affirmed.
NOTES
[1] Hartford claims that an invoice showed Astro Pak made a final waste oil delivery to the landfill the day after it was closed, but that invoice apparently is confirmation of a July 15, 1976 delivery, three days before the closing date.
[2] We have accepted the language as set forth in Fireman's Fund's brief, the language from the record being all but illegible. There appears to be no dispute over the accuracy of the text.
[3] Fireman's Fund also asserted that it was not bound by the structures of Morton Int'l because it did not participate in the deceptive approval process and marketing condemned in Morton Int'l. While Fireman's Fund did arrive late on the scene, it adopted the language, note structure and marketing practice of the rest of the industry. It thus must also bear its fair share of the losses.