769 A.2d 1053 (2001)
338 N.J. Super. 395
QUINCY MUTUAL FIRE INSURANCE COMPANY, Plaintiff-Appellant,
v.
BOROUGH OF BELLMAWR, a municipal corporation of the State of New Jersey; Century Indemnity Company f/k/a Cigna Companies f/k/a The Insurance Company of North America; Harleysville Insurance Company; and Camden County Joint Insurance Fund, Defendants-Respondents, and
Marinco, Inc., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 2000.
Decided March 20, 2001.
Frederick P. Gallin, Westfield, argued the cause for appellant (Methfessel & Werbel, Edison, attorneys; Albert I. Telsey, Newark, on the brief).
Robert L. Messick, Haddonfield, argued the cause for respondent Borough of Bellmawr.
Guy A. Cellucci, Philadelphia, PA, argued the cause for respondent Century Indemnity Company (White and Williams, *1054 attorneys; Mr. Cellucci and Lynne A. Sitarski, on the brief).
Lance J. Kialik, argued the cause for respondent Harleysville Insurance Company (Riker, Danzig, Scherer, Hyland & Perretti, attorneys; James S. Rothschild, Jr., of counsel; Steven K. Parness, Matthew H. Lewis and Keith D. Barrack, Morristown, on the brief).
Ralph J. Kmiec, Camden, argued the cause for respondent Camden County Joint Insurance Fund.
Before Judges SKILLMAN, WECKER and LESEMANN.
The opinion of the court was delivered by LESEMANN, J.A.D.
This appeal concerns allocation of insurer responsibility for environmental pollution liability of the Borough of Bellmawr (Bellmawr) caused by the Borough's dumping municipal waste into a landfill facility. The trial court held that Quincy Mutual Fire Insurance Company (Quincy) bore all of that responsibility. Quincy appeals that determination, claiming that Century Indemnity Company (Century) had insured Bellmawr during some of the time when the Borough was dumping waste into the landfill which subsequently "leaked" and permitted leaching of contaminants into ground water and the surrounding environment. Quincy argues that the trial court erred in concluding that an "occurrence" triggering Bellmawr's liability, and thus triggering insurance company liability, took place only when the contaminants from the landfill first reached the ground water, approximately 200 days after dumping began. By that time Quincy (not Century) was insuring Bellmawr, and the trial court held that Quincy was therefore obligated to defend and indemnify Bellmawr.
We agree with the trial court's conclusion. We are satisfied that under the principles set out in Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 650 A.2d 974 (1994), Hartford Accident & Indemnity Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 483 A.2d 402 (1984), and Astro Pak Corp. v. Fireman's Fund Ins. Co., 284 N.J.Super. 491, 665 A.2d 1113 (App.Div.), certif. denied, 143 N.J. 323, 670 A.2d 1065 (1995), a triggering occurred only when the leaching from the landfill caused "damage," and not at the earlier time when Bellmawr simply deposited municipal waste into a landfill designed for that purpose. Thus, we affirm the determination that Century has no obligation to Bellmawr directly, or to Quincy by way of contribution.
We are also satisfied that under principles of res judicata, Quincy cannot now maintain an action against Bellmawr or against Harleysville Insurance Company (Harleysville), an insurer who came "on the risk" after Quincy, since the claims raised in those actions were previously resolved and may not now be re-litigated.[*] Finally, we conclude that the last insurer involved, Camden County Joint Insurance Fund (JIF) is absolved from any responsibility by the "absolute pollution exclusion" language in its policy. Thus, we affirm the decision under appeal in its entirety.

I
As they relate to this appeal, the facts of the case are not complicated. Sometime *1055 between April 27, 1978 and early May 1978, Bellmawr began dumping its municipal waste at a facility known as the Kramer Landfill. In early 1981, complaints were registered respecting the Kramer Landfill, and Bellmawr ceased dumping there at the end of January 1981. On March 3, 1981, the landfill was closed pursuant to a court order and, thereafter, the United States Environmental Protection Agency (EPA) ordered a series of remedial actions designed to clean up the contamination that had emanated from the site.
The EPA then instituted cost recovery proceedings against a number of parties which had allegedly contributed to the Kramer contamination. Bellmawr was one of those parties and, along with several other defendants and third party defendants, it settled its dispute with the EPA by making a financial contribution ($449,036) to the cleanup expense.
During the time it was dumping at the Kramer site (and thereafter while the cleanup took place), Bellmawr maintained, sequentially, liability insurance with a number of different carriers. The companies, and their respective coverage periods are as follows:

 Insurer Policy Period
 Century 6/18/77  6/18/78
 Quincy 6/18/78  6/18/81
 Harleysville 6/18/81  6/18/85
 Marinco, Inc.[1] 6/18/85  12/31/86
 No Insurance: Bellmawr
 was uninsured 1/1/87  1/31/87
 JIF 2/1/87  12/31/90

Those coverage periods present one of the two time factors critical to fixing insurer responsibility for Bellmawr's loss. The other is embodied in the trial judge's finding that,
based on the stipulation [of the parties] and the testimony, particularly that of [Century's expert witness] Dr. Lee Snyder,... any contaminants placed in the landfill during May and June of 1978, would take approximately 200 days from the beginning of May to reach and pollute the ground water.
Thus, while contaminated refuse was deposited at the Kramer Landfill by the Borough during the last two months of Century's policy, it did not cause pollution or damage to the ground water and surrounding area until October or November of 1978 [by which time Quincy was providing the Borough's insurance].
On that basis the trial court held, and we agree, that Quincy, not Century is responsible for Bellmawr's loss. That is so because insurer liability is based not on when dumping took place, but on when "damage" occurred. And here, damage occurred when the leaching contaminants reached ground water, at a time when Quincy's policy was in effect.
This issuewhen an "occurrence" takes place to trigger liability insurance coveragewas first addressed by our Supreme Court in Hartford Accident and Indemnity Co. v. Aetna Life and Casualty Ins. Co., supra. There, the Court held such a triggering event takes place when injury is inflicted upon a victim. In that case, a child had been exposed to a potentially dangerous drug at a time when plaintiff Hartford was insuring the drug manufacturer. However, the child suffered injury from the drug only at some point thereafter, when Aetna's policy was in effect. The Court held that the time of the "occurrence," which precipitated liability and determined which insurer was "on the risk," turned on when the victim was injured and that "[t]he time of the accrual of the insured's liability is the determining *1056 factor, not the time of an event which ultimately results in liability." Id. at 27, 483 A.2d 402 (citations omitted).
That same principle was applied in the subsequent case of Owens-Illinois v. United Ins. Co., supra. There, the Supreme Court adopted the so-called "continuous trigger" standard, holding that in fixing the time of occurrence of an environmentally related injury, the injury must be regarded as occurring "during each phase of environmental contaminationexposure, exposure in residence (defined as further progression of injury even after exposure has ceased), and manifestation of disease." Owens-Illinois, supra, 138 N.J. at 451, 650 A.2d 974. Although Owens-Illinois dealt with asbestos-related personal injuries, the Court expressly noted that the continuous trigger theory also applied to environmental contamination cases:
Property-damage cases are analogous to the contraction of disease from exposure to toxic substances like asbestos. Like a person exposed to toxic elements, the environment does not necessarily display the harmful effects until long after the initial exposure.

[Id. at 455, 650 A.2d 974.]
Astro Pak Corp. v. Firemans Fund Ins. Co., supra, involved an issue similar to that hereliability from waste disposal at a landfill. The court followed the holding of Owens-Illinois and applied a "continuous trigger" theory. However, it also made clear that the first pull of that trigger occurred only when there had been some "damage," and that waste disposal (or dumping) by itself did not cause "damage." Damagethat is, pollution consisted of "the escape caused by [the landfill's] defect, not the placing of the pollutants into the landfill." Astro Pak Corp., supra, 284 N.J.Super. at 501, 665 A.2d 1113. And the court presented a hypothetical example to emphasize the point:
Had Astro-Pak deposited the polluting materials in a large above-the-ground tank from time to time, and the tank later leaked, causing run-off to adjoining property, it would be difficult to say that the pollution had been caused each time a bucket of sludge was thrown into the tank. Rather, the escape from the tank which caused the damage would be the operative event.... The same should be true if the hypothetical tank is replaced by a presumably impervious landfill licensed by the State to accept the pollutants.

[Ibid.]
Based on its interpretation of Owens-Illinois, Quincy argues that "damage" occurred here when Bellmawr first dumped waste into the Kramer Landfill. We disagree with that thesis, which we believe stems from a failure to recognize the factual difference between the asbestos injury involved in Owens-Illinois and the environmental contamination here. Although the rule to be applied in both cases is the same, its application varies because of the difference in the facts of the two cases.
In Owens-Illinois, the Court took pains to discuss and ultimately approve the trial court's conclusion that "an `injury in fact' triggering coverage under the insurance policies occurs on the inhalation of asbestos fibers and continues up to and including manifestation of an asbestos-related disease." Owens-Illinois, supra, 138 N.J. at 445, 650 A.2d 974. Expanding on that statement, the Court concluded that,
there is insult to tissue upon inhalation, and the insult continues during the residency, and obviously bodily injury occurs during the entire period of time, up to and including the date of manifestation of the disease.

*1057 The "overwhelming weight of authority" elsewhere acknowledges the progressive nature of asbestos-induced disease, and affirms that "`bodily injury' occurs when asbestos is inhaled and retained in the lungs.".... [W]e are satisfied, like most American jurisdictions, that medical science confirms that some injury to body tissue occurs on the inhalation of asbestos fibers, and that once lodged, the fibers pose an increased likelihood of causing or contributing to disease.
[Id. at 454, 650 A.2d 974 (citations omitted).]
That same reasoning, said the Court, also applies to the installation of asbestos material in a building under construction. It cited with approval the decision in Lac d'Amiante du Quebec, Ltee. v. American Home Assurance Co., 613 F.Supp. 1549 (D.N.J.1985), where the District Court held that, "under New Jersey law the progressive nature of asbestos-related property damage triggers every policy on the risk from installation to removal." Owens-Illinois, supra, 138 N.J. at 455, 650 A.2d 974. And, while acknowledging that there are obvious differences between personal injury and property damage claims, the Court concluded that,
[a]t least in the context of this case (in that no one suggests that the process was anything but continuous), we hold that claims of asbestos-related property damage from installation through discovery or remediation (the injurious process) trigger the policies on the risk throughout that period.
[Id. at 456, 650 A.2d 974.]
The premise of Owens-Illinois, then, both as to personal injury and property damage from asbestos, is that injury or damage is inflicted on the person or the building immediately upon exposure to the asbestos. While that injury or damage may only manifest itself at some later date, it has begun earlierwith respect to personal injury from the date of exposure to the asbestos, and with respect to property damage, from the date of installation in the building. Thus the "continuous-trigger" which imposes insurance company liability begins to run from that time of first exposure.
Here, however, there was no damage or injury at the time Bellmawr deposited municipal waste into the Kramer landfill. There was nothing comparable to the "immediate tissue damage," or "insult to tissue," or immediate building damage inflicted by asbestos "from the moment [asbestos] is installed" because the "`[f]allout of fibers from deteriorating material is continuous.'" Id. at 453-56, 650 A.2d 974 (quoting from Lac d'Amiante du Quebec, Ltee., supra, 613 F.Supp. at 1561). Rather, no damage of any kind was inflicted on anyone, or on the environment, when municipal waste was dumped into a landfill created specifically for that purpose. There was damage only when the toxic leachate forming part of that waste seeped out of the landfill and reached nearby ground water. According to the undisputed expert testimony and the findings of the trial court, that did not happen until 185 to 200 days after Bellmawr began dumping. Then, and only then, did the "continuous trigger" of liability begin to run, and by that time Century's policy had expired and responsibility lay with Quincy.
In short, the principle governing Owens-Illinois, Astro Pak, and this case is the same. The continuous trigger imposing insurance company liability begins to run when damage first occurs. In Owens-Illinois, that occurred when asbestos was installed in a building. In Astro Pak and in this case, it occurred only when contaminants *1058 leached from the landfill and damaged nearby property.[2]
Our dissenting colleague, it seems to us, has composed an argument in favor of a rule which is simply different from that embodied in Owens-Illinois, Hartford Accident & Indemnity Co., and Astro Pak Corp. The dissent says that "defining the start of the continuous trigger period is a policy decision." However, what this case actually involves is interpretation of the language of an insurance policy, not a "policy decision" with respect to which the courts would presumably have a relatively free hand. The proper interpretation of policy language such as that used here is represented by the holdings of the three cases noted, and particularly by the decision in Owens-Illinois, where the Court described as "well settled," the "general rule" that "the time of the occurrence of an accident within the meaning of an indemnity policy is not the time when the wrongful act is committed, but the time when the complaining party is actually damaged." Owens-Illinois, 138 N.J. at 452, 650 A.2d 974. See also Hartford Accident & Indemnity Co., supra, 98 N.J. at 27, 483 A.2d 402. Moreover, even were we to regard the issue as a "policy decision," that policy would have to be regarded as already established by the Supreme Court in Owens-Illinois and the other cases noted. While the dissent argues that its proposal would represent a "bright-line" rule that would be simpler to apply, we note, first, that the trial court here had no difficulty in determining (from essentially uncontradicted testimony) when actual injury occurred, and second that, even assuming the rule advocated by the dissent were easier to apply, that would obviously not justify our failure to apply the rule established by the Supreme Court. That rule, it seems to us, requires the conclusion that we, as well as the trial court, have reached here.

II
In addition to its dispute with Century, Quincy also sought declaratory judgment and related relief against Bellmawr, Harleysville, and JIF, and those entities sought similar relief against Quincy. The procedural aspects became somewhat complex, but ultimately final judgment was entered in favor of Bellmawr, Harleysville *1059 and JIF and against Quincy. We are satisfied that those determinations were correct.

A.
[Not published per direction of the Appellate Division. See note, supra.]

B.
[Not published per direction of the Appellate Division. See note, supra.]

C.
We turn next to the status of JIF, which submits three reasons why it should have no obligation to contribute to Bellmawr's damages and why Quincy's claim against it should be denied. On the substantive issue of policy coverage, JIF claims its policy (unlike Quincy's policy) contains an "Absolute Pollution Exclusion Clause," which exonerates it from any responsibility respecting the Kramer Landfill. Second, JIF claims that since Quincy did not name it as a party in the initial action filed by Bellmawr (in which Quincy filed claims against Bellmawr, Century and Harleysville), Quincy is barred by the entire controversy doctrine from any subsequent action against JIF. Finally, JIF claims the "known loss" doctrine absolves it from any responsibility, because Bellmawr knew of its liability but failed to tell JIF before JIF went "on the risk." We find the first of those argumentsthat the terms of JIF policy provides no coverage for the claims against Bellmawrto be persuasive and dispositive, and thus we need not consider its other arguments, which we consider more questionable.
JIF notes that the language of Quincy's policy which purports to limit its liability for environmental damage is similar to that described in cases such as Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co., 218 N.J.Super. 516, 528 A.2d 76 (App.Div. 1987). JIF refers to that language as the "old fashioned pollution clause" and contrasts it to the revised language used in its policy. Thus, it notes that the exclusionary language in Quincy's policy reads as follows:
This insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of ... acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.
The JIF policy, on the other hand, in addition to containing broad, express and unequivocal language excluding liability for environmental loss or damages, refers specifically to the dumping of municipal waste and compliance with any governmental cleanup order. The policy says that coverage "does not apply,"
(6) to bodily injury or property damage arising out of the actual alleged or threatened discharge, dispersal, release or escape of pollutants:

* * *
(c) which are at any time transported, handled, stored, treated, disposed of or processed as waste by or for the named insured or any person or organization for whom the Member Town may be legally responsible;....
Nor does coverage apply,
To any loss, cost or expense arising out of any governmental direction or request that the Member Town test for, monitor, cleanup, remove, contain, treat, detoxify or neutralize pollutants.
*1060 It is difficult to see how exclusionary language could be clearer or more definitive.
As noted, language similar to that contained in Quincy's policy"the old fashioned pollution clause"was employed in the policy described in Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co., supra. See also Morton Int'l, Inc. v. General Accident Ins. Co., 134 N.J. 1, 629 A.2d 831 (1993); Jackson Township Mun. Util. Auth. v. Hartford Accident & Indem. Co., 186 N.J.Super. 156, 451 A.2d 990 (Law Div.1982); Lansco, Inc. v. DEP, 138 N.J.Super. 275, 350 A.2d 520 (Ch.Div. 1975), aff'd, 145 N.J.Super. 433, 368 A.2d 363 (App.Div.1976), certif. denied, 73 N.J. 57, 372 A.2d 322 (1977). In those cases, that policy language was found to apply to alleged environmental damage. Or, to phrase the proposition in the converse, the purported exclusionary language did not exclude the environmental damage in question.
On the other hand, Vantage Dev. Corp., Inc. v. American Env't Tech. Corp., 251 N.J.Super. 516, 598 A.2d 948 (Law Div. 1991) involved policy language similar to that employed by JIF herethe so-called "absolute pollution exclusion" language. There, in a well-reasoned opinion by Judge Lawrence Smith, the Law Division concluded that the exclusion in question,
in its varying forms has been the subject of considerable judicial attention over the past several years. The courts have virtually universally agreed that the provision is clear, unambiguous and enforceable.

[Id. at 525, 598 A.2d 948.]
And it quoted with approval from Alcolac, Inc. v. California Union Ins. Co., 716 F.Supp. 1546, 1549 (D.Md.1989), where the court said that "[t]his pollution exclusion is just what it purports to beabsoluteand the Court perceives no reason why [the insurer] should be denied the benefit of its bargain." See also Nunn v. Franklin Mutual, 274 N.J.Super. 543, 644 A.2d 1111 (App.Div.1994).
We agree with the analysis in Vantage. As this court noted in Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co., supra, despite the obvious public interest in fostering remedial action respecting environmental damage, the question of an insurer's responsibility for such damage ultimately turns on the language of the insurance contract. The question is the meaning of the language employed, bearing in mind the necessity of resolving doubts or ambiguities in favor of the insured, and also bearing in mind the "principle [of] giving effect to the `objectively reasonable expectations' of the insured for the purpose of rendering a `fair interpretation' of the boundaries of insurance coverage." Broadwell Realty Servs., Inc. v. Fidelity & Cas. Co., supra, 218 N.J.Super. at 524, 528 A.2d 76 (citations omitted).
Here, the policy languagesubstantively indistinguishable from that in Vantageis clear and "absolute." It is not ambiguous, nor does the obvious meaning of the language frustrate the reasonable expectations of the policy holder. See Gibson v. Callaghan, 158 N.J. 662, 671, 730 A.2d 1278 (1999); Stiefel v. Bayly, Martin & Fay, 242 N.J.Super. 643, 651, 577 A.2d 1303 (App.Div.1990).
Quincy does not claim any such ambiguity in JIF's policy and we see none. The policy is clear. There is no reason why this court should decline to enforce it precisely as it is written. Accordingly, we are satisfied that there is no ground for liability under JIF's policy and no basis to reverse the trial court's determination on that issue.
For the reasons set out above, both in Part I as relates to the dispute between *1061 Quincy and Century, and Part II as respects the dispute between Quincy on the one hand and Harleysville, Bellmawr and JIF on the other, the judgments and orders under appeal are affirmed.
WECKER, J.A.D., concurring and dissenting.
I concur in the decision that res judicata bars Quincy Mutual Fire Insurance Company's action against the Borough of Bellmawr and Harleysville Insurance Company, and that the Camden County Joint Insurance Fund is protected by the pollution exclusion in its policy. I agree that the allocation of responsibility for defending and indemnifying Bellmawr in this environmental pollution case is controlled by the principles set forth in Owens-Illinois, Inc. v. United Insurance Co., 138 N.J. 437, 650 A.2d 974 (1994). However, I differ from the majority with respect to the application of the "continuous trigger" theory to this case. I conclude that coverage was triggered when Bellmawr first deposited toxic materials into the Kramer landfill. The record establishes that each such deposit immediately set in motion an unalterable process of contaminating the leachate which inexorably works its way into the underlying and surrounding soil. I therefore respectfully dissent from the judgment in favor of Century, which insured Bellmawr during an admittedly brief period while Bellmawr was dumping toxic waste into the Kramer landfill.
In Owens-Illinois, the underlying liability for which the insured sought coverage was both bodily injury and property damage resulting from its installation of Kaylo, an insulating product that contained asbestos. In adopting the "continuous-trigger theory," the Court rejected two more limited alternatives: "the exposure theory" and "the manifestation theory." 138 N.J. at 449-51, 650 A.2d 974. The Court also rejected any rule whose only rationale was to maximize coverage. Id. at 452, 650 A.2d 974. Under the continuous-trigger rule, "the continuous period from exposure to manifestation" is the "occurrence" that triggers coverage. Id. at 450, 650 A.2d 974 (citations omitted). Exposure is defined as "the date on which the injury producing agent first contacts the body." Id. The "conceptual underpinning" of the theory "is that injury occurs during each phase of environmental contaminationexposure, exposure in residence (defined as further progression of injury even after exposure has ceased) and manifestation of disease." Id. at 451, 650 A.2d 974.
I disagree with the majority with respect to its implicit finding that dumping pollutants into the landfill did not constitute a triggering "exposure" as defined by Owens-Illinois. As the Court described the issue in Owens-Illinois,
What is not so easily understandable is the point at which the law will say that injury requires indemnity. In that sense, the concept of injury, like the related concepts of duty and causation, is an instrument of policy. After all, the air we breathe and the water we drink contain trace elements of toxic substances. The law decides when an invasion of the body constitutes an injury entitling one to damages.
[138 N.J. at 457, 650 A.2d 974 (emphasis added).]
While the Court explicitly concentrated on personal injury rather than property damage issues in Owens-Illinois, id. at 456, 650 A.2d 974, nevertheless, the Court's description of the property damage aspect of environmental contamination is significant:
It is recognized that there is a natural deterioration of asbestos-containing materials resulting in the release of fibers, release that may occur by a slow continuous *1062 degradation of the insulating surface which may be accelerated by the air movement and vibration which occurs in most buildings. More specifically, friable asbestos material breaks down as a result of vibrations, deterioration, or direct contact and damage and, as it ages, it can lose its cohesive strength. Fallout of fibers from deteriorating material is continuous.

[citation omitted.]
Property-damage cases are analogous to the contraction of disease from exposure to toxic substances like asbestos. Like a person exposed to toxic elements, the environment does not necessarily display the harmful effects until long after the initial exposure.

[emphasis added.]
That description bears a striking resemblance to the damage resulting from Bellmawr's pollution.
The Century policy covering Bellmawr defined "occurrence" to include "injurious exposure to conditions, which results, during the policy period, in personal injury or property damage...."[3] Thus the critical question is whether property damage resulted during the policy period.
Both the motion judge and my colleagues rely on Century's expert witness, Dr. Ralph Lee Steiner, who testified without contradiction that it likely took between 185 and 209 days for Bellmawr's polluting material to leach into the groundwater.
Dr. Steiner described leachate as "a flow of liquid migrating downward through a porous material." The downward movement "is a result of gravity and capillary action." He agreed that "contaminated leachate" from material deposited at the landfill eventually finds its way into the groundwater. It is clear from Dr. Steiner's testimony that the landfill was not the equivalent of an enclosed tank or container, and that by its very nature, toxic materials deposited in the landfill would, without fail, seep into the ground and run off as leachate into the groundwater, which in turn penetrates the soil below and downstream of the landfill. The contaminated leachate therefore is not the product of some accidental leak. On the contrary, it represents the natural and unavoidable progression of the original dumping, which must be deemed the "exposure" that is the starting point of an "occurrence" that triggers coverage.
The fact that it may have taken some 200 days for the polluting leachate to reach a particular point does not mean that damage to property did not occur earlier. The property, that is, the landfill, was contaminated as soon as the toxic material was dumped, for that is when the toxins began their damaging journey through the groundjust as the asbestos fibers in Owens-Illinois began their damaging journey through the air immediately upon installation of the insulation.
In Astro Pak Corp. v. Fireman's Fund Insurance Co., 284 N.J.Super. 491, 499-500, 665 A.2d 1113 (1995), involving coverage for contamination of the Kin-Buc landfill, we rejected Hartford's argument that because plaintiff had ceased depositing pollutants in the landfill before Hartford issued its policy, there was no "occurrence" within its policy period. We applied the continuous trigger theory in order to identify "the point at which the law will say that injury requires indemnity" pursuant to Owens-Illinois. We did so, however, in the context of a dispute over the last pull of the triggerthe end *1063 of the covered "occurrence"and not (as here) in a dispute about the first pull of the trigger.
The Hartford policy at issue in Astro Pak provided that "property damage claims `arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.'" 284 N.J.Super. at 495, 665 A.2d 1113. Under that definition, extending Hartford's coverage to the post-deposit period when damage was discovered does not imply that the initial deposit itself would not have been part of the covered "occurrence" if the Hartford policy had been in effect at that date. Our holding in Astro Pak that the Kin-Buc "occurrence" included the discovery of pollution that had leaked from the landfill is consistent with our holding here that the deposit itself was a covered occurrence because the property was damaged by that deposit.
Because the Kin-Buc landfill "supposedly was constructed to be impervious so that the deposited wastes would not affect the surrounding land or water," 284 N.J.Super. at 493, 665 A.2d 1113, we analogized the Kin-Buc landfill to an in-the-ground tank and held that the "escape" of polluting material was due to a "defect" in the "presumably impervious landfill"the equivalent of a leak in the tank. But Dr. Steiner testified that the Kramer landfill had no "liner" or "impervious membrane," and there is no other evidence to support an analogy between the leaching that occurred in the Kramer landfill and a leaking tank.
Quincy's expert calculated the time it would take for leachate containing Bellmawr's toxic waste to seep into the groundwater beneath this landfill. He did so essentially by factoring the number and depth of the landfill's layers and the actual rainfall for the period.[4] Theoretically, the landfill could hold a certain amount of contaminated material without generating leachate, much the way a sponge holds water until it is saturated and then begins to drip. However, it can hardly be disputed that rain eventually will fall in sufficient quantity to saturate the landfill, and leachate eventually will travel downward into the ground beneath the landfill.
The Court noted in Owens-Illinois that defining the "trigger-of-coverage" was a policy decision. 138 N.J. at 457, 650 A.2d 974. In my view, the policy decision expressed by the Court in adopting the continuous trigger ruledefining the triggering "occurrence" as a "continuous period from exposure to manifestation" of damagerequires the conclusion that Bellmawr's dumping was the initial "exposure" that triggered coverage under the Century policy. The trial judge relied on Dr. Steiner's 200-day calculation of the leachate's travel time to establish coverage-triggering property damage in this case. But that calculation is legally irrelevant to the question before us under Owens-Illinois; it merely represents evidence that the "occurrence" continued for at least 200 days. Moreover, such an application of the Owens-Illinois continuous-trigger rule would require each insurer (or a court) to calculate the date when pollutants that were dumped into a landfill most likely leached into the groundwater in order to determine the start of the continuous trigger period and thus whether an insurer owed coverage to the polluter. That is an unnecessarily burdensome and impractical means for determining when an "occurrence" first triggers coverage.[5]
*1064 The approach I believe Owens-Illinois requires makes both theoretical and practical sense. From a theoretical point of view, when toxic material deposited in or on property creates a condition that is dangerous to life or health, the deposit itself affects the utility of the property, and the property is damaged thereby. It is therefore consistent with Owens-Illinois, as well as the Century insurance contract, to hold that the deposit is the initial triggering exposure that defines the occurrence for purposes of insurance coverage. There is also a practical advantage to so defining the "occurrence." That is its ease of application. It is a bright-line rule that is easily administered by insurers and, if necessary, applied by the courts.[6]
The decision in Hartford Accident & Indemnity Co. v. Aetna Life & Casualty Insurance Co., 98 N.J. 18, 483 A.2d 402 (1984)(adopting Judge Skillman's decision in the Law Division), does not call for a different result. Hartford involved a coverage issue arising out of a product liability claim against a prescription drug manufacturer. There the drug that allegedly caused injury to a child was prescribed and first ingested during the Aetna policy period; however, the child did not show any sign of bodily injury until after the end of the Aetna policy term. Judge Skillman distinguished "cumulative and progressive diseases, such as asbestosis," and explained that "Hartford presented no evidence to show that the harm to [the child] from the administration of Atropisol was cumulative and progressive. Rather, her bodily injury could have been caused solely by an overdose or idiosyncratic reaction" to the drug on the date when she first exhibited symptoms of injury. 98 N.J. at 29, 483 A.2d 402. "Alternatively, the [drug] may have had a beneficial effect upon her [during the policy period] but then began to cause damage to her subsequent to that date after a threshold amount of the drug had been administered. However, the evidence presented by Hartford was silent on this issue...." Id. Thus on the available evidence in Hartford, the Court could not conclude that the child "had suffered `bodily injury' during the term of the Aetna policy." Id.
By contrast, in this case, Bellmawr's damaging pollution set in motion a "cumulative and progressive" process more like the onset of asbestosis involved in Owens-Illinois than the drug reaction involved in Hartford. We began in this case from the premise that Bellmawr's dumping was a factual cause of some damage, whereas in Hartford, there was insufficient evidence that the drug prescription or the initial ingestion of the drug itself caused any harm.
I would reverse the decision dismissing Quincy's claim for contribution against Century and remand for calculation of Century's proportional share of Bellmawr's indemnification claim and entry of judgment thereon. I agree with the majority that responsibility should be apportioned among the carriers on the risk during the continuous trigger period in direct proportion to the number of days that each provided *1065 coverage during that period.[7] Under the stipulated facts, that would place responsibility on Century for 45 out of a total of 880 days and on Quincy for 835 of 880 days.[8]
NOTES
[*] Sections II A and B of this opinion discuss res judicata as that doctrine relates to Quincy's attempts to maintain actions against Harleysville and Bellmawr. Those discussions do not concern issues of general interest, and thus we have chosen not to publish Section II A and B with the remainder of this opinion.
[1] The parties' briefs refer to Marinco, Inc., as "apparently defunct" and say Marinco could not be served with summons and complaint. No one presses any argument against Marinco, and thus we will not refer to it further in this opinion.
[2] We note that even were we to accept Quincy's argument that Century bears a share of responsibility because Century was "on the risk" when Bellmawr began dumping, Century's proportionate share of liability would only be based on one or two months exposure (between commencement of dumping in April/May 1978 and expiration of the Century policy on June 18, 1978) out of a total of some two and one-half years of dumping between May 1978 and January 1981. That would represent approximately forty-five days of a total of 880 days, or about .05 percent. That number would be little more than de minimis.

Quincy, however, claims that under its theory Century would actually be responsible for twenty-five percent of Bellmawr's liability since Century provided coverage during some part of one of the four years involved. That argument is based on an apparent misapprehension of the discussion of pro rata risk allocation in Owens-Illinois, where the Supreme Court employed hypothetical fact patterns, with different insurers "on the risk" during different time periods. Although the Court spoke in terms of years of coverage, it did so by way of suggesting that a company providing coverage over a longer period would normally bear a greater share of the insured's liability than one which was involved for a shorter period. That is, if all other factors were the same, the responsibility of a company that provided coverage for two years would be twice that of a company that provided such coverage for one year. Nothing in the Court's discussion would support Quincy's strained argument that an insurer who is on the risk for any part of a year should, for some unexplained reason, be responsible for a full year of the total period involved.
[3] The insurance contracts at issue in Owens-Illinois included similar definitions of a covered "occurrence" 138 N.J. at 447, 650 A.2d 974.
[4] He did a similar calculation based upon the average rainfall in the area.
[5] Cf. Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 327, 712 A.2d 1116 (1998)(determining the appropriate method of allocation among various levels of insurance available over a seventeen-year period, under the principles of Owens-Illinois), where the Court cited its previous identification of relevant "public interest factors ... including the efficient use of available resources, the interests of simple justice, and the need for an `efficient response' to the logistical challenge posed by environmental insurance litigation. [Owens-Illinois, 138 N.J.] at 472-74, 650 A.2d 974."
[6] It may also permit more predictable risk analysis for underwriting pollution coverage, which presumably would benefit both insurers and insureds.
[7] I would not preclude a more accurate measure in an appropriate case, for example, if the proofs revealed the quantity or volume of polluting material deposited by the insured during each policy period. See, e.g., Astro Pak, 284 N.J.Super. at 494, 665 A.2d 1113 (allocating liability by volume of pollutants deposited).
[8] The resulting contribution from Century, which appears to be 45/880 or 5.1 percent of Bellmawr's $449,036 settlement with the EPA (plus 5.1 percent of Bellmawr's defense costs) obviously represents a minimal share in this case. Nevertheless, it reflects an appropriate allocation, consistent with Owens-Illinois, and therefore cannot be overlooked as de minimis.