778 A.2d 1132 (2001)
343 N.J. Super. 430
AETNA CASUALTY & SURETY CO., Plaintiff,
v.
PLY GEM INDUSTRIES, INC., et al., Defendants. and
Hoover Treated Wood Products, Inc., Defendant/Third-Party Plaintiff-Respondent,
v.
Commercial Union Insurance Company, Third-Party Defendant/Appellant, and
Federal Insurance Company, Third-Party Defendant/Respondent, and
Greater New York Mutual Insurance Company et al., Third-Party Defendants.
Superior Court of New Jersey, Appellate Division.
Argued March 20, 2001.
Decided August 2, 2001.
*1133 Jack Fuchs, admitted pro hac vice, argued the cause for third-party defendant-appellant Commercial Union Insurance Company (Melli, Guerin & Melli and Thompson Hine & Flory of the Ohio bar, attorneys; Christopher M. Bechhold, pro hac vice, Cincinnati, OH, and Mary E. Romano, Paramus, of counsel; Mr. Bechhold, Gary M. Glass, pro hac vice, Cincinnati, OH, and Ms. Romano, on the brief).
Anthony Bartell argued the cause for third-party plaintiff-respondent Hoover Treated Wood Products, Inc. (McCarter & English, attorneys; Mr. Bartell, Newark, of counsel; Mr. Bartell and Whitney A. Klein, on the brief).
Thomas E. Schorr argued the cause for third-party defendant-respondent Federal Insurance Company (Smith Stratton Wise Heher & Brennan, Princeton, and Cuyler Burk, attorneys; Peter Petrou, Parsippany, on the brief).
Before Judges STERN, COLLESTER and FALL.
The opinion of the court was delivered by *1134 STERN, P.J.A.D.
Third party defendant Commercial Union Insurance Company ("CU") appeals from a February 7, 1997 order denying its motion for summary judgment and granting the cross-motion of defendant-third party plaintiff Hoover Treated Wood Products, Inc. ("Hoover") for summary judgment on coverage issues, a March 17, 1998 order granting Hoover's motion for partial summary judgment requiring that CU pay certain unreimbursed defense costs relating to litigation in the State of Maryland, and a November 19, 1998 order granting Hoover's motion for partial summary judgment (certified as a final judgment) requiring CU to pay $76,361.75 in costs relating to that litigation. CU contends that there was no coverage for the claims made against Hoover, a manufacturer of fire retardant plywood ("FRTP").
Hoover asserts that the February 7, 1997 order establishing coverage is interlocutory and leave to appeal has not been granted. CU challenges that order on the grounds that the claims do not constitute "an occurrence" and did not cause "property damage" or damage to property of a third party and, in any event, did not do so within the policy period, and were excluded from coverage under the "your product" and "business risk" exclusions. CU also challenges the March 17, 1998 and November 19, 1998 orders with respect to the Maryland litigation, asserting that the trial judge improperly used choice-of-law principles to apply the law of New Jersey and that Hoover is collaterally estopped from re-litigating certain factual issues concerning coverage. It also asserts that Hoover already received payment in full for all defense costs relating to the Maryland litigation and that, in any event, it should be required only to pay its pro rata share. Hence, CU contends that, even if we do not reverse the February 7, 1997 order, we must reverse the grant of summary judgment relevant to the costs of defense in Maryland.

I.
Between 1986 and 1991, eighty-five law suits had been filed in New Jersey courts by builders, developers, and home owners associations against Hoover and other FRTP manufacturers and distributors. The suits sought to recover damages caused by the incorporation of FRTP in the roofing systems of townhouses and condominiums built and purchased by those plaintiffs. By order dated January 14, 1991, the Chief Justice consolidated all of the pending and future FRTP litigation and transferred it to a single judge in Middlesex County for purposes of discovery and management. Additional cases were subsequently added to the consolidated proceedings.[1]
On April 18, 1990, Aetna, excess insurer of Hoover and defendant Ply Gem Industries, Inc. (of which Hoover is a division or wholly owned subsidiary), filed a "complaint for declaratory judgment" seeking an order that its policies provided no coverage for the claims arising out of the FRTP litigation and that it was not obligated to defend or indemnify Hoover.[2] On August 2, 1990, Hoover filed an answer which contained counterclaims and cross-claims *1135 as well as a third-party complaint against its fifteen insurers, including CU. In its answer Hoover generally denied the material allegations of the complaint and sought, by way of counterclaim, costs of defense, indemnity, and damages for breach of contract. In its third party complaint against CU and other insurers, Hoover asserted the same cause of action and sought the same relief. Ultimately, seventeen carriers were brought into the action.
CU responded to Hoover's third party complaint by generally denying the material allegations of the complaint and asserting by way of defense, among other things, failure to comply with the terms and conditions of CU's policies, application of exclusionary provisions in the policies, the absence of any covered bodily injury or property damage, and that the rights and remedies of the parties were controlled by Georgia, not New Jersey, law. CU contends that Georgia law applies because Hoover's offices are located there and the policy was issued to Hoover at its address in Thomson, Georgia.
On February 7, 1997, the trial judge denied CU's motion for summary judgment on the coverage issue and granted Hoover's cross-motion for defense and indemnification. Thereafter, on March 17, 1998, the judge granted Hoover's motion for partial summary judgment and determined that Hoover was "not collaterally estopped" from seeking coverage as a result of the jury verdict against Hoover in a Florida case (Pulte Home Corp., Inc. v. Ply Gem Industries, Inc., 804 F.Supp. 1471 (M.D.Fla.1993)). He ordered CU to "reimburse Hoover for all of its unreimbursed costs incurred in defending" the eight Maryland FRTP suits. Finally, by order dated November 19, 1998, the judge directed that CU pay Hoover a total of $76,361.75 which he determined constituted Hoover's "reasonable costs of defending" the Maryland FRTP suits and which remained outstanding from other carriers. As already noted, the judge certified this order as final. There is no contest as to that order's "finality." See R. 4:42-2.

II.
Hoover is a producer of pressure treated lumber, plywood, and specialty wood (FRTP). It chemically treats wood resulting in products which include fire retardant treated lumber, plywood, shingles and shakes for both interior and exterior use. Its fire retardant plywood sheathing was used as a roofing component of condominiums and other types of multi-unit residences nationwide.
FRTP was intended to retard the spread of fire from one dwelling unit to another. It was chemically treated such that the high heat of a fire would cause it to char instead of igniting and spreading the flames. The nature of the treatment of FRTP varied depending on the chemicals used. Generally, plywood was impregnated with chemical salts that produced acid in the presence of heat and moisture. It was the acid which caused the FRTP to blacken and char, reducing the flame spreading capability of the plywood. The heating process also caused the chemical salts to generate gases and water which further retarded the spread of the fire. The FRTP wood was cheaper than constructing parapets and allowed architectural changes in roof designs. Consequently, it was incorporated in "approximately 100,000 townhouses or condominium units in New Jersey" alone.
In 1987 the American Plywood Association published two reports which warned of defects when FRTP was used as roof sheathing. Studies revealed that FRTP "may suffer severe structural degradation" when exposed to high temperatures. Subsequently, additional literature "indicated problems associated with the use of *1136 FRT Plywood in roof systems." Ultimately, about 170 law suits were instituted against Hoover by builders and homeowners organizations associated with multi-family housing construction. They sought recovery for property damage caused by the installation of the allegedly defective FRTP treated by Hoover and the costs of remediation. In addition to litigation, claims for property damage were filed, seeking recovery from Hoover.
The trial judge has concisely stated the background as follows:
The underlying FRT claims filed against Hoover sought damages for physical injury to property. These claims for property damage grew out of the manufacture of Pro-Tex, a brand name for an FRT chemical used to treat wood products including plywood roof sheathing. The FRT wood was installed into roof systems of certain multi-family residential structures, schools, nursing homes, and even a prison. The manufacturing process consisted of treating raw wood obtained from lumber vendors with a chemical substance, Pro-Tex, which inhibited burning. Typically, a 4' X 8' FRT plywood sheet was placed in the roof on either side of the common wall between adjoining dwelling units forming a fire retardant barrier designed to slow the spread of fire from one unit to another. Prior to the availability of these FRT products builders were required to erect masonry parapet walls which extended above the roof line. These parapet walls were costly and often interfered with the aesthetic design of the residential buildings. In New Jersey and other states, building codes were amended to permit the use of FRT wood to meet fire retardant standards. Some building and construction officials required that FRT wood be incorporated into roof systems. Either because construction officials required it or because FRT wood lowered cost and gave builders flexibility of design, FRT wood and in particular FRT plywood sheathing was widely used starting in the early 1980's.
In the FRT litigation plaintiffs have alleged continuous and progressive physical injury to property caused by the incorporation of allegedly defective FRT wood treated and or sold by Hoover into the roofs of the structures involved. The law suits allege that defective FRT wood installed in the roofs degraded and eventually became too weak to support the roof structure. Damage to property occurred because of leaks caused by the weakened structure or by the destruction of other roof components when it was necessary to remove and replace the defective FRT wood. Apparently degradation did not affect all roof systems nor was the degradation process uniform. The degradation process may have been enhanced if the FRT wood was exposed to sun, moisture, excessive heat in an attic or by faulty plumbing.
In response to this background, Aetna commenced this declaratory judgment action,[3] and as we have already noted, CU appeals the trial court's coverage determinations against it.
CU issued three comprehensive general liability ("CGL") policies to Hoover for annual periods between November 1984 and November 1987. CU also issued two *1137 umbrella policies covering Hoover between November 1985 and November 1987. The CGL policies provided Hoover with coverage for "bodily injury" and "property damage" liability as follows:
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

bodily injury or property damage
to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent and may make such investigation and settlement of any claim or suit as it deems expedient but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
The policies define a covered "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." "Property damage" is defined as either
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
The umbrella policy provisions followed the same form as the CGL policies.
The plaintiffs in the underlying actions (builders, developers and homeowner associations) against Hoover and others, alleged that the FRTP damaged residential roofing systems, and sought recovery on a variety of theories including breach of contract, breach of express and implied warranties, common law fraud, New Jersey Consumer Fraud Act violations, New Jersey Product Liability Act violations, fraudulent concealment, intentional misrepresentations, and strict liability in tort, as well as negligence. The plaintiffs claimed that the defendant FRTP manufacturers, chemical treaters and suppliers negligently manufactured, inspected, and marketed FRTP, negligently failed to warn of its dangers, and were thus strictly liable in tort for placing FRTP in the stream of commerce. The complaints alleged that when the FRTP degraded, it lost strength, flexibility, resilience, and structural integrity, posing a risk of physical injury to individual homeowners and property damage to their units and other roof components. Replacement or repair of the defective sheathing involved more than simply removal of the wood. The removal process itself resulted in destruction and necessitated replacement of other components of the roofing system separate from that of the FRTP sheets. The complaints also alleged that FRTP deterioration damaged parts of the residential units and could cause further damage in the future.
In moving for summary judgment in Hoover's third-party action, CU argued that, since the trial judge had already determined that the underlying actions for which coverage was sought constituted solely economic losses recoverable under the Uniform Commercial Code ("UCC"), those claims fell within the business risk exclusion of CU's policies, and as such did not constitute a covered "occurrence" within the meaning of CU's policies. The exclusion *1138 provided that the coverage "does not apply ... to property damage to the named insured's products arising out of such products or any part of any such products."
In a November 22, 1996 letter opinion denying CU's motion and resulting in the February 1997 order, the judge explained that in ruling on the "economic loss" issue in the underlying FRTP litigation, his "sole focus" was on the relationship between the plaintiffs in those suits and the treaters, manufacturers, chemical suppliers, and builders involved in FRTP manufacture, sale, and distribution. However, when he considered the insurance coverage issues in the declaratory judgment action, "the focus [was] on the contractual relationship between Hoover, a treater of FRTP, and [Hoover's] insurance carriers." He concluded that the "economic loss" ruling in the underlying litigation was not "based upon a finding that there was no damage to other property" within the meaning of the pertinent insurance policies. Thus, a judgment in the underlying FRTP litigation did not preclude a finding of a duty by a carrier to defend and indemnify its insured pursuant to a CGL policy. The judge emphasized that the "economic loss" ruling he made in the underlying action simply asserted that the damages to those plaintiffs arose from a failure of the FRTP to perform properly or as warranted, and that those plaintiffs had an adequate remedy for their damages within the UCC. The judge pointed out "that a variety of damages can result from such a failure [to perform], including damages to another's property or person."
Consequently, the court denied CU's claim that the "own product" exclusion barred coverage. The court thus ruled that, while the exclusion precluded indemnification for Hoover's own cost of repair or replacement of its defective products, it did not bar indemnification for claims of damage to "other property" caused by the insured's poor workmanship or defective products. However, the court noted that whether or not damage to other property existed in a given case was a factual issue which could not be decided on a motion for summary judgment.
The court also rejected CU's claim that the "sistership exclusion," which denied coverage for the cost of preventive or curative action when the insured withdrew a product "from the market or from use because of any known or suspected defect" or dangerous condition, barred Hoover's claims for indemnification. The court observed that that exclusion did not bar coverage "for actual damage caused by the very product giving rise to curative action." Furthermore, Hoover never recalled any of its FRTP.
The court also found meritless CU's claim that no covered "occurrence" took place. The judge reasoned that if there was damage to other property, as alleged by the plaintiffs in the underlying action, there was an "occurrence" as defined by the policy. Finally, the February 7, 1997 order provided that CU must defend Hoover in the underlying FRTP litigation against allegations that Hoover's product caused damage to the plaintiffs' property.
Following entry of the February 7, 1997 order, Hoover moved for an order directing CU to defend Hoover's FRTP claims and to pay all unreimbursed defense costs. Hoover specifically pointed to eight cases emanating from the State of Maryland which remained unresolved and for which Hoover required a defense. Hoover argued that the plaintiffs in the eight Maryland cases sought recovery for damage to property other than the FRTP itself. In support of its assertions that it was entitled to a defense and costs in those cases, Hoover submitted selected pages from the respective complaints as evidence of the *1139 allegations contained therein. Although not in the record before us, Hoover's motion papers represented that, in each of these cases, the FRTP was installed during the policy periods between 1984 and 1987.
In a written opinion filed on October 22, 1997, Aetna Casualty & Surety Co. v. Ply Gem Industries, Inc., 313 N.J.Super. 94, 101-02, 712 A.2d 717 (Law Div.1997), the trial judge rejected CU's choice-of-law arguments with respect to the duty to defend since he concluded that there was no conflict between the law of Georgia and New Jersey. Id. at 100-02, 712 A.2d 717. Comparing the policy language with the underlying complaints, the judge found that CU's duty to defend was triggered by the complaints' assertions of property damage to other parts of the roofs and building. Id. at 102-04, 712 A.2d 717. Finally, the judge ruled that principles of collateral estoppel did not apply to bar coverage on the basis of the Florida jury determination in Pulte Home Corp. Inc., v. Hoover Treated Wood Corp., that Hoover fraudulently induced purchases of FRTP knowing that it would deteriorate prematurely. Id. at 105-110, 712 A.2d 717.[4]
The court, therefore, granted Hoover's motion for summary judgment and ordered that CU was obligated to defend and to pay any unpaid defense obligations. Id. at 110, 712 A.2d 717. After review of a motion for reconsideration, on March 17, 1998, the judge entered an order consistent with his October 22, 1997 published opinion.
Thereafter, the parties squabbled concerning the obligation to pay based on the interlocutory order and the amount properly due. CU also argued that because of the settlements with other insurance carriers, Hoover had no out-of-pocket or unreimbursed expenses or costs of defense.
The judge ruled that CU had to pay only "reasonable defense costs." Ultimately, by order entered on November 19, 1998, CU was directed to pay Hoover $35,516 which constituted the reasonable costs of defending seven of the eight Maryland actions, and an additional $40,845.75 which constituted one-half of the reasonable costs of defending the eighth Maryland law suit. As already noted, the court then certified the November 19, 1998 order as a final judgment.

III.
We note, at the outset, that because the February 7, 1997 order was not a final judgment nor certifiable as final under R. 4:42-2, and because CU neither sought nor obtained leave to appeal, we review that order only to the extent it must be considered in reviewing the November 19, 1998 order which was properly certified as final pursuant to the Rule. While Hoover properly contends that the February 7, 1997 order, like the March 17, 1998 order, was neither final nor certifiable, we nevertheless conclude it must be reviewed to the extent that the properly certified order of November 19, 1998 was premised thereon. Cf. Tradesoft Technologies, *1140 Inc. v. Franklin Mut. Ins. Co., 329 N.J.Super. 137, 141, 746 A.2d 1078 (App. Div.2000) (declaration of obligation to defend and indemnify not certifiable, but granting leave to appeal nunc pro tunc "in the interest of substantial justice, particularly because of the inevitable effect of the order appealed from on the remaining claims"). However, as the November 19, 1998 order deals only with an obligation to defend and pay costs of defending the Maryland litigation, we should not be deemed to address the duty to indemnify except to the extent it is affected by consideration of the issues we do address.

IV.
CU contends that the trial court erred in its February 7, 1997, order when it denied CU's motion for summary judgment and granted Hoover's cross-motion on the coverage issues because Hoover failed to establish that the FRTP claims were covered under CU's policies. CU contends that (1) there was no covered "occurrence" under CU's policies because the losses suffered were only economic losses; (2) Hoover failed to establish that its FRTP caused damage to other property; and (3) there was no proof that damage to other property occurred during a CU policy period.[5] We address the contentions in that order.

A.
CU argues that since the trial court, in a February 21, 1992, decision in the underlying action, dismissed the plaintiffs' strict liability and negligence claims against Hoover on the grounds that these were economic losses recoverable under Uniform Commercial Code (UCC) and breach of contract theories, Hoover could not now make a claim against CU's policies for the same losses because they were not covered occurrences under CU's policies.
The trial judge rejected this argument, observing that he made his economic loss ruling while adjudicating the rights and responsibilities of the plaintiffs builders, developers, homeowner's associations and homeowners against Hoover who was a defendant, among others, in that litigation. The present suit, however, required adjudication of the rights and responsibilities of Hoover and its insurers, an adjudication which required examination of the insurance contract between the parties. The judge therefore found that his holding that the plaintiffs in the underlying FRTP suit had an adequate remedy for damages under the UCC, thus barring a cause of action in strict liability and negligence, did not also require a ruling that CU was relieved of a duty to defend and indemnify Hoover pursuant to its CGL policy. We agree.[6]
In Spring Motors Distribs., Inc. v. Ford Motor Co., 98 N.J. 555, 560-61, 489 A.2d 660 (1985), the Supreme Court held that a commercial purchaser of defective goods was restricted to a cause of action under the UCC, and could not pursue claims based on negligence and strict liability *1141 principles. Accordingly, in Goldson v. Carver Boat Corp., 309 N.J.Super. 384, 707 A.2d 193 (App.Div.1998), in which plaintiff sought recovery from the manufacturer of a boat for damages to the boat caused by the boat's defective engines, we said that:
Where, as here, there is no substantial disparity in bargaining power, and the only damage caused by the defective product is to the product itself, contract law, and the law of warranty in particular, is best suited to set the metes and bounds of appropriate remedies. Damage to a product itself is most naturally understood as a warranty claim because the cause of action rests on the premise that the product has not met the customer's expectation.... In contrast, "tort damages generally compensate the plaintiff for loss and return him to the position he occupied before the injury." East River Steamship Corp. v. Transamerica Delaval, Inc., [476 U.S. 858, 873 n. 9, 106 S.Ct. 2295, 2303 n. 9, 90 L.Ed.2d 865, 878 n. 9 (1986).] ... The objective of tort law is generally to protect the public's interest in freedom from harm. Tort principles are thus suited for resolving claims involving "unanticipated physical injury." [Spring Motors Distribs., Inc. v. Ford Motor Co., supra, 98 N.J. at 580, 489 A.2d 660.]

[Id. at 397-98, 707 A.2d 193.]
In the suit brought by Hoover against CU and its other insurers seeking defense and indemnification for claims asserted in the underlying FRTP litigation, the issue was not whether the FRTP plaintiffs could recover in tort, or whether they were relegated to remedies available under the UCC. On the contrary, the issue was whether, regardless of the nature of the cause of action against Hoover, the damages these plaintiffs suffered and for which Hoover was deemed liable fell within the coverage offered by CU's policies.
The CGL policies obligate CU to pay all sums to which Hoover becomes legally obligated because of "bodily injury or property damage" caused by "an occurrence" during the policy period. Bodily injury was defined as "injury, sickness or disease sustained by any person which occurs during the policy period." Property damage was defined as "physical injury to or destruction of tangible property" which occurred during the policy period or "loss of use of tangible property which has not been physically injured or destroyed" as long as the loss of use was caused "by an occurrence during the policy period." An occurrence was "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." However, the policy had four specific exclusions from coverage related to the insured's own products or work:
This insurance does not apply:

....
m. to loss of use of tangible property which has not been physically injured or destroyed resulting from
1. a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or
2. the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental personal injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by *1142 any person or organization other than an insured;
n. to property damage to the named insured's products arising out of such products or any part of such products;
o. to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;
p. to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein[.]
Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 235, 405 A.2d 788 (1979), addressed the scope of exclusions similar to the ones in CU's policy, in the context of the duty to defend a masonry contractor which was sued for damages which consisted of the cost of correcting faulty workmanship on a project. The Court observed that the consequence of a contractor's not performing his or her work well is a risk of every business venture, and not covered by the CGL policy. "[T]he replacement or repair of faulty goods and works is a business expense, to be borne by the insured-contractor in order to satisfy customers." Id. at 239, 405 A.2d 788. However, the insured contractor also bears the risk of "injury to people and damage to property caused by faulty workmanship." Ibid. These injuries can expose the contractor "to almost limitless liabilities" and, according to the Court, "are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting." Id. at 240, 405 A.2d 788. The accidental injury to persons or property of another is not a "cost attendant upon the repair of [the insured's] faulty work." Id. at 239-40, 405 A.2d 788. The Court also made it clear that the theory upon which the plaintiff proceeded was irrelevant to a determination of whether there was a covered "occurrence" under the CGL. Id. at 240-41, 405 A.2d 788.
Thus, subsequently in Hartford Ins. Group v. Marson Constr. Corp., 186 N.J.Super. 253, 256-57, 452 A.2d 473 (App. Div.1982), certif. denied, 93 N.J. 247, 460 A.2d 656 (1983), we held there was a duty to defend an insured general contractor who was sued for improper workmanship in the construction of walls which had caused recurring structural leaks. Starting with the proposition that ordinarily the duty of an insurer to defend is broader than its obligation to indemnify, we said that:
The insurer's obligation to defend is triggered by a complaint against the insured alleging a cause of action which may potentially come within the coverage of the policy, irrespective of whether it ultimately does come within the coverage and hence irrespective of whether the insurer is ultimately obliged to pay. This principle, of course, applies where there is a factual issue between the third-party claimant and the insured, the resolution of which may result in an adjudication that at least part of the claim against the insured is within the policy coverage.

[Id. at 257, 452 A.2d 473 (citations omitted).]
Relying on Weedo, supra, we observed that the business risks exclusion applies only with respect to claims for damage to the insured's own work arising out of his or her faulty workmanship. That exclusion "does not, however, apply to damage caused by the defective work to the property *1143 of others." 186 N.J.Super. at 258, 452 A.2d 473. After examining the complaint by the property owners against the general contractor, we concluded in Hartford Ins. that it sought to recover for damage done to metal panels installed by another contractor caused by the insured's defective workmanship. Id. at 259, 452 A.2d 473. Consequently, as to this claim, the insurer had a duty to defend and summary judgment thereon was improper. Id. at 260, 452 A.2d 473. Compare Unifoil Corp. v. CNA Ins. Co., 218 N.J.Super. 461, 528 A.2d 47 (App.Div.1987) (no duty to defend where all allegations against a paper manufacturer were barred by a specific policy exclusion). See also Grand Cove II Condominium Ass'n, Inc. v. Ginsberg, 291 N.J.Super. 58, 76, 676 A.2d 1123 (App. Div.1996) (duty to defend "converted to a duty to reimburse pending the outcome of the coverage litigation"); Heldor Industries, Inc. v. Atlantic Mut. Ins. Co., 229 N.J.Super. 390, 551 A.2d 1001 (App.Div. 1988) (exclusion barred coverage for repair costs where no claim for injuries or damage to third party).
In Newark Ins. Co. v. Acupac Packaging Inc., 328 N.J.Super. 385, 746 A.2d 47 (App.Div.2000), we recently considered the concept of economic loss, business risk, and work performance exclusions against the backdrop of policy provisions similar to those involved in this case, and emphasized the
critical distinction between insurance coverage for tort liability for physical damages to other persons or property, and protection from contractual liability of the insured for economic loss caused by improper workmanship. Ordinarily, the coverage is for tort liability for physical damage to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

[Id. at 391, 746 A.2d 47 (citations omitted).]
The insured in Newark Ins., supra, contracted with an advertising firm to supply over two million pacquettes to be filled with Revlon skin cream, which pacquettes were to be attached to an advertising card that would be bound in an August 1996 edition of Glamour magazine. Id. at 388-89, 746 A.2d 47. The pacquettes were defective in that they "could not withstand the pressure applied to them in the binding process," causing some of them to leak and damage the printed advertising cards on which they were glued. Id. at 389, 746 A.2d 47. Both Revlon and the advertising agency made claims against the defendant packaging company, which submitted the claims to its insurer, Newark Insurance Company. The claims were denied except for the one asserting physical injury to the cards onto which the lotion pacquettes actually leaked. Id. at 390-91, 746 A.2d 47. The carrier's motion for summary judgment in its declaratory judgment action was granted based upon the business risk exclusion and sistership provisions in the policy. Id. at 391, 746 A.2d 47.
Judge Steinberg phrased the question before us as requiring a determination of whether the damages for which the insured sought indemnification were "an economic loss caused by improper workmanship, which is a business risk commonly absorbed as a business expense, or, on the other hand, is the result of an accidental injury to property of others giving rise to tort liability." Id. at 392-93, 746 A.2d 47. Citing Weedo and Heldor, we observed that "[i]f the risk involves injury to people or damage to property caused by faulty workmanship, the `business risk' or `work performance' exclusion does not exclude coverage." Id. at 393, 551 A.2d 1001. We found that the claims for damage to the cards, which were the property of Revlon *1144 and the advertising agency and were separate and distinct from the pacquettes prepared by the insured, were sufficient to invoke the insurer's duty to defend and indemnify outside of the business risk exclusion. Consequently, "[t]he business risk exclusion only applie[d] regarding claims for damage to the insured's own work arising out of his faulty workmanship, and d[id] not exclude damage to other property not manufactured or provided by the insured, yet caused by the insured's poor performance." Id. at 398-99, 551 A.2d 1001.
With respect to the "sistership exclusion," we concluded that such an exclusion "has no applicability when the claim is for property damage claimed to have been suffered by another property owner, such as Revlon." Id. at 401, 746 A.2d 47. Judge Steinberg explained that the sistership exclusion applied only in those situations where, because of the actual failure of the insured's product, similar or "sister" products were withdrawn from the market in order to prevent the failure of those products, which may have not yet failed but possibly contained the same defect. Id. at 402, 746 A.2d 47. We held that "[t]he sistership exclusion, by its very terms, is limited to those costs associated with the withdrawing of a product from the market. It does not exclude from coverage damage already caused to the property of a third party." Ibid.
Under this analysis, we agree with the trial judge that CU was obligated for the costs of defense in the Maryland cases because they sought recovery for property damage to third parties.
Although they lack specificity, each of the eight complaints in the Maryland cases alleges damage to property other than the FRTP included in the roofs of the homes, and seek the repair and replacement costs associated with it. As a result, because "[t]he insurer's obligation to defend is triggered by a complaint against the insured alleging a cause of action which may potentially come within the coverage of the policy, irrespective of whether it ultimately does come within the coverage and hence irrespective of whether the insurer is ultimately obligated to pay," Hartford Ins. Group v. Marson Constr. Corp., supra, 186 N.J.Super. at 257, 452 A.2d 473; see also, e.g., Voorhees v. Preferred Mutual Ins. Co., 128 N.J. 165, 173-74, 607 A.2d 1255 (1992); Salem Group v. Oliver, 128 N.J. 1, 5-6, 607 A.2d 138 (1992), the trial judge correctly ruled that these Maryland complaints alleged a cause of action based on damage to property other than the FRTP itself, which in turn invoked CU's obligation to defend Hoover.

B.
CU contends that even if Hoover established that its FRTP damaged other property, in order for there to be coverage the property damage had to have occurred during a CU policy period, which in this case was between November 1985 and November 1987. CU maintains that there was no evidence that any property damage occurred during that CU policy period.
CU argued to the trial judge that, although the complaints alleged that the FRTP was installed during CU's policy's periods, damage to other property could only have occurred years later after the FRTP began to deteriorate. Thus, according to CU, the ensuing damage to other property must have "occurred" after the expiration of CU's policies.
The trial judge rejected that argument and held, in his October 22, 1997 opinion, that a plaintiff was not required to plead "with specificity ... a date denoting the beginning of damages." 313 N.J.Super. at 104, 712 A.2d 717. According to the judge, the absence of such a date in the complaints did not prevent those plaintiffs *1145 "from alleging damage from the time of installation" of the FRTP. Ibid. Nor did the complaint's failure to state a certain date upon which manifestation of damage was discovered absolve CU of its duty to defend where coverage was triggered by the allegations in the complaint. Ibid. To require such specificity would, according to the trial judge, require every insured "to prelitigate the case on the accusation by the insurance company that some of the facts or claims may be untrue." Id. at 105, 712 A.2d 717.
We need not explore the rules regarding pleading and the specificity requirements of Maryland law. We will assume they have no more demanding requirements than our liberal rules of pleading. See R. 4:5-2, R. 4:5-7. In any event, there is no contest "that CU's policies were in effect at the time FRTP was being installed in the buildings," 313 N.J.Super. at 104, 712 A.2d 717, or that the carrier was promptly given proof that the installation in all cases occurred during the policy period and that the duty to defend may be "triggered by facts indicating potential coverage that arise ... outside the complaint" where those facts are known to the insurer. SL Industrs., Inc. v. American Motorists Ins. Co., 128 N.J. 188, 198-99, 607 A.2d 1266 (1992).[7]
The trial judge concluded that the allegations in the complaints, coupled with the information concerning the date when these condominiums were constructed using FRTP, were sufficient to trigger CU's duty to defend Hoover in the Maryland suits. As already noted in the context of the exclusions, the duty to defend arises when the complaint states a claim constituting a risk under the policy. 313 N.J.Super. at 102-05, 712 A.2d 717. See also Voorhees v. Preferred Mutual Ins. Co., 128 N.J. 165, 173-74, 607 A.2d 1255 (1992) ("it is the allegation in the complaint of a cause of action which, if sustained, will impose a liability covered by the policy"); Danek v. Hommer, 28 N.J.Super. 68, 77, 100 A.2d 198 (App.Div.1953), aff'd o.b., 15 N.J. 573, 105 A.2d 677 (1954). An insurer's duty to defend is determined by comparing the allegations in the complaint with the policy language. Voorhees, supra, 128 N.J. at 173, 607 A.2d 1255. When the two correspond, the insurer has a duty to defend regardless of the claim's actual merit. Ibid. Indeed, if the complaint is ambiguous, doubts are to be resolved in favor of the insured and consequently in favor of coverage. Id. at 173-74, 607 A.2d 1255. Thus, "the duty to defend ... is determined by whether a covered claim is made, not by how well it is made. A third party does not write the complaint to apprise the defendant's insurer of potential coverage; fundamentally, a complaint need only apprise the opposing party of disputed claims and issues." Id. at 174, 607 A.2d 1255.
In opposition to Hoover's motion for summary judgment on the coverage issues, CU argued that a covered claim was not asserted "because none of the complaints specifically alleged damage" that occurred during the policy periods. 313 N.J.Super. at 103-04, 712 A.2d 717. However, the judge felt that "[t]he absence of a date denoting the beginning of damages" did not "free" CU of its duty to defend because the Maryland plaintiffs alleged installation of the FRTP at a time during which CU's policies were in force. Id. at 104, 712 A.2d 717.
*1146 Notwithstanding our general agreement with the trial judge on the coverage issues and the duty to defend, including the general rules concerning sufficiency of the pleadings, we part company on this issue and remand for further proceedings relating to the dates on which the property damage began. We do not find this record sufficient to support a conclusion that the FRTP starts to deteriorate upon installation, so as to warrant summary judgment. After all, an "occurrence" generally occurs "when the complaining party is actually damaged," Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 452, 650 A.2d 974 (1994), and the record before us does not require a finding of a "continuous trigger" or "progressive injury" commencing upon installation.
While the policies impose on CU a "duty to defend" any suit against Hoover seeking damages for "bodily injury or property damage" even if the allegations are groundless, false or fraudulent, CU's contractual liability extends only to property damage "which occurs during the policy period." Anyway, while the Maryland pleadings may sufficiently allege installation of Hoover's FRTP during the policy period, there must be an allegation of "property damage" within the policy period to constitute a "covered claim."
As noted, the trial judge concluded that the absence of an allegation that the property damage occurred, or at least began to occur within the policy period, was irrelevant to the issue of whether CU had a duty to defend. However, we cannot say as a matter of law that "property damage" occurs, or begins to occur, the moment a potentially defective component is installed. To state a claim for property damage under the policy and to trigger the duty to defend, the damage must have "occurred" during the policy period. However, all that is evident from the pleadings and documents in this record with respect to the Maryland complaints is that the FRTP which Hoover manufactured, and upon which these suits against Hoover are based, was installed within the policy periods and caused damage to other property at some point in time. There is no allegation as to when the property damage occurred and thus, no way to determine, without more, whether the allegations of property damage caused by the insured's product were covered claims because they occurred during the policy periods.
As the trial judge noted, "[i]t is undisputed that CU's policies were in effect at the time FRTP was being installed," 313 N.J.Super. at 104, 712 A.2d 717, and some of the complaints do provide dates when the damage to the plaintiffs' property was discovered. Those dates fall outside of the CU policy periods. Thus, for purposes of CU's duty to defend Hoover in the Maryland cases, the date on which the "other property" damage took place is critical. Summary judgment was therefore premature because the dates of the "property damage" were in dispute and were a genuine issue of material fact.
At least in the absence of more proofs, we reject the theory that the "continuous trigger" or "progressive damage" theory requires us to conclude there was "property damage" upon installation. While an "occurrence" usually occurs when a "complaining party is actually damaged," Owens-Illinois v. United Ins. Co., supra, 138 N.J. at 452, 650 A.2d 974 (an asbestos case), property damage may be the result of a "progressive indivisible injury or damage... for which civil liability may be imposed ... within each of the years of a CGL policy." Id. at 478, 650 A.2d 974. See also Carter-Wallace Inc. v. Admiral Ins. Co., 154 N.J. 312, 712 A.2d 1116 (1998) (applying Owens-Illinois to progressive environmental property damage). As a result, property into which asbestos-laden *1147 products were incorporated have been deemed damaged at the time of installation because of the immediately harmful nature of asbestos. Lac d'Amiante du Quebec, Ltee. v. Am. Home Assurance Co., 613 F.Supp. 1549, 1560-61 (D.N.J.1985).
However, the situation is viewed differently when the progressive indivisible injury or damage is to property caused by toxic dumping, regardless of the toxicity of the material being dumped. In Astro Pak Corp. v. Fireman's Fund Ins. Co., 284 N.J.Super. 491, 665 A.2d 1113 (App.Div.), certif. denied, 143 N.J. 323, 670 A.2d 1065 (1995), one of the plaintiff's insurers, Hartford, argued that it was not obligated to indemnify the plaintiff for landfill cleanup costs under a continuous trigger theory because it insured the risk after the plaintiff had ceased depositing pollutants in the landfill. Id. at 499-500, 665 A.2d 1113. We affirmed the trial court's ruling that "the slow progression of these contaminants into the surrounding land and water continued well after" the plaintiff ceased its dumping, and "[t]his exposure implicate[d] The Hartford's policies." Id. at 500, 665 A.2d 1113. Judge Dreier explained that the surrounding property was damaged (polluted), not because of the plaintiff's dumping, but because the landfill was defectiveit leakedand allowed the toxic substances deposited there to escape. Id. at 501, 665 A.2d 1113. It was only because of the defective nature of the landfill that the plaintiff's actions constituted possible pollution. Ibid.
Earlier this term we reached an opposite conclusion. In Quincy Mut. Fire Ins. Co. v. Bor. of Bellmawr, 338 N.J.Super. 395, 398, 769 A.2d 1053 (App.Div.), appeal filed and certif. granted, ___ N.J. ___, ___ A.2d ___ (2001), the Borough of Bellmawr dumped municipal waste in the Kramer Landfill, beginning sometime between April 27 and early May 1978. The landfill was closed by the EPA in 1981 and Bellmawr was required to make a $449,036 contribution to the cleanup expenses. Ibid. The municipality sought indemnification from its five insurers for the period from June 1977 through December 1990. Id. at 398-99, 769 A.2d 1053. The trial judge ruled that Century, which had insured Bellmawr between June 18, 1977 and June 18, 1978, was not obligated to pay under its policy because its expert had testified that it would take 200 days for contaminants deposited in May and June 1978 to reach and pollute the groundwater, taking that damage outside Century's policy period. Id. at 399, 769 A.2d 1053.
A majority of this court agreed that Century was not responsible for Bellmawr's loss "because insurer liability is based not on when dumping took place, but on when `damage' occurred. And here, damage occurred when the leaching contaminants reached ground water, at a time when Quincy's [the appellant's] policy was in effect." Ibid. The court noted and discussed the inherent differences between application of the continuous trigger theory of coverage in toxic tort cases (asbestosOwens-Illinois) and environmental pollution cases (landfill contamination Astro Pak), id. at 400-02, 769 A.2d 1053, and concluded:
The premise of Owens-Illinois, then, both as to personal injury or property damage from asbestos, is that injury or damage is inflicted on the person or the building immediately upon exposure to the asbestos. While that injury or damage may only manifest itself at some later date, it ha[d] begun earlierwith respect to personal injury from the date of exposure to the asbestos, and with respect to property damage, from the date of installation in the building. Thus the "continuous-trigger" which imposes insurance company liability begins to run from that time of first exposure.
Here, however, there was no damage or injury at the time Bellmawr deposited *1148 municipal waste into the Kramer landfill. There was nothing comparable to the "immediate tissue damage," or "insult to tissue" or immediate building damage inflicted by asbestos "from the moment [asbestos] is installed" because the "`[f]allout of fibers from deteriorating material is continuous.'" [Owens-Illinois, supra, 138 N.J.] at 453-56, 650 A.2d 974 (quoting from Lac d'Amiante du Quebec, Ltee., supra, 613 F.Supp. at 1561). Rather, no damage of any kind was inflicted on anyone, or on the environment, when municipal waste was dumped into a landfill created specifically for that purpose. There was damage only when the toxic leachate forming part of that waste seeped out of the landfill and reached nearby ground water. According to the undisputed expert testimony and the findings of the trial court, that did not happen until 185 to 200 days after Bellmawr began dumping. Then, and only then, did the "continuous trigger" of liability begin to run, and by that time Century's policy had expired and responsibility lay with Quincy.

[Id. at 402, 769 A.2d 1053.]
The majority held that the principle governing both environmental property damage and toxic exposure personal injury cases was the same: "The continuous trigger imposing insurance company liability begins to run when damage first occurs." Id. at 403, 769 A.2d 1053. With asbestos, it begins with installation; with pollutant dumping, it begins only when the surrounding property is contaminated thereby. Ibid.
Judge Wecker dissented. She disagreed with the majority's reading of Owens-Illinois to preclude dumping of pollutants as the time when damage began to "occur", thus triggering exposure. Id. at (409), 769 A.2d 1053 (dissent). She concluded that "the toxins began their damaging journey through the groundjust as the asbestos fibers in Owens-Illinois began their damaging journey through the air immediately upon installation of the insulation." Id. at 410, 769 A.2d 1053.
We agree with the Quincy majority that property damage must, in fact, occur before an insurer's liability on a CGL policy can be invoked under the "continuous trigger" theory. But even if the dissent is correct and there may be an "occurrence" upon the initial introduction of the inevitably damage-causing substance into the property, there are contested proofs that the FRPT was defective at the time of installation and, in any event, there is no record to support application of the "continuous trigger" theory to determine the scope of insurer liability.
The record before us contains no dispositive expert proofs concerning the FRTP deterioration process, or how that process inflicts damage to the structure in which it is installed.[8] Nor are there uncontested *1149 material facts warranting application of the "continuous trigger" upon installation of the FRTP.

V.
There is a second, related reason for agreeing with CU that the trial judge erred in granting Hoover's motion for partial summary judgment compelling it to defend and pay unreimbursed defense costs in connection with the Maryland cases.[9]
As we already noted, the trial judge concluded that "the absence of specific dates in the complaints regarding when manifestation is said to be discovered does not free CU of its duty to defend" as long as the allegations state a covered cause of action. 313 N.J.Super. at 104-05, 712 A.2d 717. On that basis, the judge further concluded that CU breached its duty to defend and, as a result, imposed an obligation to pay defense costs for the Maryland litigation. We believe his determination was premature in light of Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 483 A.2d 402 (1984).
The issue there was whether Aetna breached its duty to defend its insured, a drug manufacturer, in a suit for damages resulting from the ingestion of one of its products. Id. at 21, 483 A.2d 402. Aetna provided coverage before February 4, 1971, the date the drug was dispensed to the parents of the two-and-a-half-year-old injured plaintiff, and thereafter only through February 10, 1971. Ibid. Plaintiff Hartford provided coverage on February 11, 1971, which coverage remained in effect *1150 feet through February 21, 1971, the date on which the personal injuries to the child first became apparent. Ibid. Hartford defended the action after Aetna disclaimed on the ground that the damage to the plaintiff in the underlying action did not occur during its policy period, but brought suit against Aetna seeking to make it liable for fifty percent of the judgment and defense costs incurred as a result of the underlying litigation. Ibid.
While acknowledging that an insurer has a duty to defend even ill-founded or groundless suits, the Court held that the duty extends only to claims within the coverage of the policy. Id. at 22, 483 A.2d 402. The Court adopted Judge Skillman's opinion which quoted Burd v. Sussex Mut. Ins. Co., 56 N.J. 383, 388-90, 267 A.2d 7 (1970):
The sense of the covenant is to defend suits involving claims which the carrier would have to pay if the claimant prevailed in the action. The covenant to defend is thus identified with the covenant to pay. That is the basis of the rule that ordinarily a carrier who defends unsuccessfully may not later deny coverage, absent an express agreement with the insured reserving a right to deny coverage. Merchants Indemnity Corp. v. Eggleston, 37 N.J. 114, 127, 179 A.2d 505 (1962). The obligation to defend "groundless, false or fraudulent" claims does not mean that the carrier will defend claims which would be beyond the covenant to pay if the claimant prevailed. It means only that a carrier may not refuse to defend a suit on the ground that the claim asserted against the insured cannot possibly succeed because either in law or in fact there is no basis for a plaintiff's judgment.
....
[I]f the trial will leave the question of coverage unresolved so that the insured may later be called upon to pay, ... the carrier should not be permitted to control the defense.
....
In such circumstances the carrier should not be estopped from disputing coverage because it refused to defend. On the contrary, the carrier should not be permitted to assume the defense if it intends to dispute its obligation to pay a plaintiff's judgment, unless of course the insured expressly agrees to that reservation. This is not to free the carrier from its covenant to defend, but rather to translate its obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant to pay.
[Hartford Accident & Indem. Co., supra, 98 N.J. at 23-24, 483 A.2d 402.]
The Court concluded that the case before it was "clearly one in which the insurer had a factual basis for disputing coverage," and one in which the resolution of that dispute depended on facts that would not be decided by the trial of the underlying negligence action against the insured. Id. at 24, 267 A.2d 7. The underlying action was based on the insured's failure to warn the injured plaintiff's doctor about the dangers of the drug, the success of which action did not depend upon the date when the drug was administered, when the infant plaintiff suffered injury, or when the injuries manifested themselves. Id. at 24, 267 A.2d 7. Yet the precise dates on which the bodily injury occurred to the infant plaintiff was critical to the resolution of the dispute between Hartford and Aetna. Ibid.
The conflict of interest which would naturally arise was apparent. The interest of the insured required counsel to focus solely upon rebutting evidence that the warnings about the drug were inadequate and that it was its administration which was the proximate cause of the bodily injury, *1151 while Aetna had an interest in showing that the relevant events on which the underlying plaintiff's claim was based occurred after the expiration of the policy period. Consequently, the Court concluded that the case [was] one in which "the insurer not only was within its rights in refusing to take over the defense on behalf of its insured but was in fact obligated to follow that course once it denied coverage." Ibid.
Finding that Aetna's refusal to defend its insured in the underlying action was fully justified by the existence of a substantial question as to whether its policy provided coverage for that claim, the Supreme Court affirmed our vacation of the partial summary judgment which awarded Hartford 50% of the cost of defense based upon Aetna's breach of duty to defend. The Court concluded that "Aetna's obligation to pay either the judgment or defense costs [had to] be determined solely by whether its policy provided coverage" for the underlying claim. Id. at 26, 267 A.2d 7.
The Court then turned to the facts adduced at the trial of the underlying action and found that there was absolutely no evidence to show that the infant plaintiff actually suffered bodily injury on or before the expiration of Aetna's policy insuring the drug manufacturer. It rejected Hartford's attempt to analogize this situation with the asbestos cases which had found insurance coverage for asbestosis based on the date of exposure rather than the date the disease manifested itself. The Court observed that, in those cases, expert proofs established that each inhalation of asbestos into the lungs caused bodily injury which was immediate and progressively became more harmful to the victim. Id. at 28, 267 A.2d 7.
In essence, Hartford failed to present any evidence of the infant's exposure to the drug prior to the expiration date of Aetna's policy, stating that "[s]ome diseases, such as asbestosis, are cumulative and progressive, but others are not, and Hartford presented no evidence to show that the harm to [the infant plaintiff] from the administration [of the drug] was cumulative and progressive." Id. at 29, 267 A.2d 7. Thus, the absence of proof led the Court to conclude that Aetna was not responsible for providing either a defense or indemnity to its insured. Ibid. See also Grand Cove II Condo., supra, 291 N.J.Super. at 73, 676 A.2d 1123 ("[w]here a conflict exists between an insurer and its insured by virtue of the insurer's duty to defend mutually-exclusive covered and non-covered claims against the insured, the duty to defend is translated into a duty to reimburse the insured for the cost of defending the underlying action if it should ultimately be determined, based on the disposition of that action, that the insured was entitled to a defense") (citing Burd v. Sussex Mutual Ins. Co., supra, 56 N.J. at 390, 267A.2d 7).
For purposes of the underlying Maryland cases, it was not necessary for the plaintiffs to allege or establish the date on which the damages occurred. However, in the absence of proof justifying application of the "progressive injury" or "continuous trigger" doctrine, the carrier had a right not to defend and risk a duty to reimburse its insured for the costs of defense.
CU has raised a material issue as to whether its policies provided coverage for the claims, and CU had not breached its duty to defend. Under the circumstances CU's obligation to defend, like its obligation to indemnify, must await resolution of the underlying actions or, if not established therein, a trial of the relevant factual issues concerning whether the Maryland plaintiffs suffered injury during the CU policy period.

*1152 VI.
In light of our disposition, we find that only a few additional comments are appropriate. It is obvious from our lengthy discussion that we agree with the trial judge that Florida litigation, resulting in a jury verdict of fraudulent inducement against Hoover based on its knowledge of the premature deterioration of its FRTP, does not collaterally estop Hoover from seeking coverage. 313 N.J.Super. at 105-110, 712 A.2d 717. The Florida litigation did not involve a coverage issue and, in any event, resulted in a vacated judgment and consent order dismissing the complaint.
Finally, we note that the ultimate duty to pay the unreimbursed costs of defense may depend upon whether there is ultimately sufficient proof warranting application of the "continuous trigger" theory in which case Owens-Illinois, Carter-Wallace, and Universal-Rundle Corp. v. Commercial Union Insurance Co., 319 N.J.Super. 223, 725 A.2d 76 (App.Div.), certif. denied, 161 N.J. 149, 735 A.2d 574 (1999), would apply.[10]See also Muralo Co., Inc. v. Employers Ins. of Wausau, 334 N.J.Super. 282, 294-95, 759 A.2d 348 (App. Div.2000).
Otherwise, the general rule is that when an insurer has wrongfully refused to defend an action and is then required to reimburse the insured for its defense costs, the "duty to reimburse is limited to allegations [actually] covered under the policy, provided that the defense costs can be apportioned between covered and non-covered claims." SL Industrs., supra, 128 N.J. at 214-15, 607 A.2d 1266; Grand Cove II Condo., supra, 291 N.J.Super. at 73-74, 676 A.2d 1123. In those situations where defense costs cannot be apportioned, the insurer is required to assume the cost of the defense for both covered and non-covered claims. SL Industrs., supra, 128 N.J. at 215, 607 A.2d 1266. In short, the insurer is obligated "to pay only those defense costs reasonably associated with claims covered under the policy." Ibid. In the absence of proof to justify application of the "progressive injury" or "continuous trigger" doctrine from the time of installation, CU's obligation to pay the costs of defense will depend on the determination of precisely when the damage to the Maryland plaintiffs' property occurred. If it is determined that the "property damage" occurred during the effective dates of CU's policies, then the defense costs properly attributable to those claims should be awarded to Hoover.

VII.
Notwithstanding our essential agreement with most of the trial judge's rulings, the orders of March 17, 1998 and November 19, 1998 are reversed for the reasons stated, and the matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] The New Jersey Legislature amended the Home Warranty Act to establish a fund for resolving FRTP claims, and the Department of Community Affairs ("DCA") entered this litigation to recoup moneys it advanced for the FRTP failures. See N.J.S.A. 46:3B-13 et seq.; N.J.A.C. 6:25A-1.3. The trial judge worked with a mediator and the DCA to settle claims filed after June 8, 1992.
[2] Because of the settlement of most of the FRTP litigation, including settlement with other carriers by Hoover, we concentrate on the procedural history only as it relates to the present dispute between Hoover and CU.
[3] The briefs and record reflect that most of the litigation, including all the claims regarding the New Jersey sites, has been settled. The litigation remains open as to a few carriers including third party defendant Federal Insurance Company which has therefore appeared as a respondent on CU's appeal, but we are told that Hoover has settled with most of its carriers.
[4] The later history of that case revealed that while the appeal was pending, the plaintiff, Pulte Home Corp., settled with Hoover for half the amount of the original verdict; the matter was remanded to the Florida district court which vacated the judgment, Aetna Casualty & Surety Co., supra, 313 N.J.Super. at 105, 712 A.2d 717, and the suit was then dismissed with prejudice. Hence, the judge in our case ruled that the settlement would not collaterally estop Hoover in the present coverage matter. Id. at 107-08, 712 A.2d 717. The court also noted that collateral estoppel requires an identity of issues. Id. at 108, 712 A.2d 717. The issue in the Florida case was one of liability, whereas the issue in the present case was one of policy coverage. Hence, the issues were not identical. Id. at 109-10, 712 A.2d 717.
[5] There is no suggestion that Hoover had no duty to remediate or that that question affects the issue of coverage. "[T]he question of whether a carrier has an obligation to defend or indemnify under an insurance policy poses a very different issue than whether the insured can be held responsible for losses to a third party or the costs of remediation." Reliance Ins. Co. v. Armstrong World Industries, Inc., 292 N.J.Super. 365, 390, 678 A.2d 1152 (App.Div.1996) (concurring opinion). Hence, there is no suggestion that the deterioration was not so extensive as to affect the duty to remediate, as opposed to issues relating to coverage.
[6] Independent of the fact a different issue is involved, we reject CU's suggestion that the doctrine of judicial estoppel somehow applies to bar a judge from reconsidering or changing a holding or issue he or she decided in prior proceedings.
[7] CU does not claim that it was unaware of the documents submitted with the complaints, which indicate the date the Maryland plaintiffs' respective buildings were constructed with FRTP incorporated in the roofing systems. See also the trial judge's conflicts of law discussion, 313 N.J.Super. at 102, 712 A.2d 717.
[8] The record contains an October 15, 1993, letter from William Kibbel of the Tri-County Inspection Co., Inc., of Yardley, Pennsylvania, which describes the degradation process of FRTP as:

the result of a mechanism called "acid hydrolysis" which has the effect of breaking down the cell structure of the wood. The force driving this chemical reaction is heat. When sufficient heat is applied to the plywood in the presence of moisture, which is naturally present in wood, some components of the treatment chemicals are broken down into an acid which begins degrading the wood. The result is a loss in strength properties particularly bending, strength and impact resistance.
Kibbel's letter gives no indication how much heat is required to initiate the chemical breakdown, how long the process takes, or whether the product's integration into residential roofs renders the degradation inevitable.
The record also contains a portion of the direct and cross-examination of James Frank Herndon, Hoover's director of research and development, given on March 12, 1993, in the Florida federal district court trial of Pulte Home Corp. v. Hoover Treated Wood Products, Inc. While "not a building expert," Mr. Herndon testified that he did not consider FRTP plywood to be a "defective product" and that when FRTP plywood "or other products, are placed into an attic space where there's inadequate ventilation to remove moisture, to remove heat, that not only [FRTP plywood], but other products will, with time, suffer strength loss and possibly degradation." Herndon said that Hoover had been producing fire retardant treated plywood "for years and years, and it had performed well and it's still performing well."
Christopher Bechhold, an attorney with the firm representing CU in this litigation, provided a certification designed to refute Hoover's claim that FRTP deteriorates upon installation, causing immediate damage to its surrounding property. He certified that "it takes several years for the FRT Plywood to deteriorate to the point where it becomes sufficiently damaged," and that it takes "several more years" before the FRTP is "weakened," loses strength, and causes shingles to separate, nails to pop, trusses to crack, and leaks to occur, giving rise to third-party property damage.
[9] We agree with the trial judge that there was no conflict between New Jersey and Georgia law with respect to principles governing determination of an insurer's duty to defend. Accordingly, no choice-of-law analysis is required regarding coverage. Veazey v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986). We add that the same month the trial court decided its published opinion in this case, the Supreme Court of Georgia decided Colonial Oil Industrs. v. Underwriters, 268 Ga. 561, 491 S.E.2d 337, 338 (1997), noting that an insurer in Georgia "is under no obligation to independently investigate the claims against its insured." However, the court also said that where the allegations in the complaint do not otherwise place the insured's claim within policy coverage, if the insured notifies the insurer of factual contentions which would bring the claim under the policy terms, "the insurer has an obligation to give due consideration to its insured's factual contentions and to base its decision on true facts." Id. at 338-39. The obligation is similar to the obligation of carriers in this State. S.L. Industries, supra, 128 N.J. at 198-99, 607 A.2d 1266. Thus, while an insurer in both states need not investigate a claim which on its face does not constitute a covered occurrence, it cannot ignore information brought to its attention which would transform that claim into a risk insured against by the policy.
[10] As noted earlier, we are advised that Hoover has settled with all but three of its seventeen carriers and that most of the underlying FRTP cases have been settled. The remaining issues essentially deal with apportionment of the costs of defense and indemnification of the settled as well as the pending cases.